*Thompson, J.
The two questions arising [*232 233] out of this case for decision are,
1. Whether the verdict was against evidence, on the question of seaworthiness ; and,
*2. Whether the plaintiff ought not to have [*234] disclosed to the defendant that the vessel would have a clearance for Falmouth.
There is, in every insurance, an implied warranty that *302 the ship shall be seaworthy when the risk commences; that she shall be tight, strong, and in all respects, fit for the intended voyage. ¿.The insurer undertakes only to indemnify against the extraordinary and unforeseen perils of the sea, and not against the ordinary perils to which every ship must be exposed in the usual course of the voyage proposed. If a vessel become incapable of proceeding on the voyage insured, the presumption prima faeie is, that it arises from unseaworthiness, unless some adequate cause be shown to occasion the damageT/ But, if any such cause be shown, so that the loss may be fairly attributed to sea damage, and the underwriters mean to rely on the ship’s not being seaworthy at her departure, the onus probandi will then lie on them. To test the present case by these rules, we find the only testimony, as to the immediate cause of the disaster, is that contained in the two protests. From the first, made by the master, chief mate, and one seaman, it appears that the vessel left Honduras the 27th of January. That on the 28th January, she met with strong gales, so that they were obliged to close reef the fore-topsail, and close reef the main-topsail. That on the 29 th, strong gales, and a heavy sea'from the noth ward, still under reefed sails, the vessel making much water. On the 30th the wind abated; and nothing remarkable occurred until the 2nd of February, when they found the leak increased to that degree that they could not keep her free from water with the pumps. They then bore away for Swan’s Island, which being unable to reach, they determined to return to Honduras, where they arrived the 18th of February. During the above time, they encountered, at various periods, stiff gales and heavy squalls. Thus we find the ship, from the 28th of January until the 13th of Februarjr, a very considerable part of the time laboring under stiff gales and heavy weather, far beyond the ordinary perils of the sea. The master swears • that shortly after leaving Honduras, he met with excessive hard winds; that the navigation was difficult and dangerous, *303 and *he was obliged to carry a very heavy press [*235] of sail, in order to avoid the reefs and keys; and that after he had met with considerable injury, and it was determined again to return to Honduras, he experienced heavy gales, and various changes of weather. This I think sufficient to show that the loss may be fairly attributed to sea damage, and throw the onus probandi of unseaworthiness on the defendant. On this subject, the testimony is certainly very contradictory, and, in my opinion, irreconcilable. The implied warranty on the part of the assured is, that the vessel was seaworthy at the commencement of the risk; this was on the 21st of November, 1799, while she lay at Kingston. The testimony on the part of the plaintiff is, substantially, that in April, 1799, when he had it in contemplation to purchase this vessel, he procured ship-carpenters to examine her, and ascertain her situation, previous to completing the bargain; no possible inducement, therefore, to a fraud, on the part of the plaintiff. They examined her accurately, bored in places most liable to rot, and found her sound; stripped off her sheathing; found her bottom English elm, and perfectly sound; her naval hoods and head knees sound; took off the plank, so as to examine her top timbers, and found them sound and good. The testimony of Captain Dorgan, likewise, who arrived in March preceding from the West Indies, in this ship, with a cargo of 500 hogsheads of sugar and molasses, tends to show that she was a very tight, strong vessel, and only ten years old. This, it is said, however, was seven months before the commencement of the present insurance. But if she was in the situation represented by these witnesses in April, it is inconceivable that she could be in the rotten and decayed state represented by the defendant’s witnesses in November thereafter. The examination made by the defendant’s witnesses was in February, 1800, three months after the commencement of the risk. All the progressive decay, therefore, from the November preceding, was at the risk of the underwriter But it appears incred *304 ible that all this decay could have taken place in that period. for the defendant’s witnesses represent that when she was surveyed by them, two thirds of her timbers [*236] were rotten, many *of her plank started and rotten; her bends so rotten and loose that with a crow bar they might have been ript up for twenty feet; her upper works in a very bad state; and, in short, that there was a general decay of her timbers, bends, and plank. The master of the ship, however, swears, that had she arrived in any port on the continent of America, she might have been repaired, fit for the voyage, for fifteen hundred, or two thousand dollars; but if she had been in the situation represented by the defendant’s witnesses, she must have been irreparable. On the whole, the testimony is so directly and palpably contradictory that it is impossible to ■reconcile it. It thus becomes a question of credibility of witnesses, and this is peculiarly within the province of a jury to determine. Whether the vessel was seaworthy or not, is also matter of fact, to be submitted to a jury. These points have been decided by a respectable jury of merchants; and in such case, where the question is doubtful, and the testimony contradictory, I think, the court ought not to interfere by granting a new trial, unless it appears that injustice has been done, or that further light may be thrown on the subject on another examination.
In the case of Ashley v. Ashley, 2 Strange, 1142, the judge who tried the cause (which was upon a promissory note for 5,0001 which the defendant insisted was forged) certified, that the weight of the evidence was with the plaintiff, and he thought the jury would have found for the plaintiff, but they found a verdict for the defendant. And on an application for a new trial, the court said, as there was evidence on the part of the defendant, the jury‘were proper judges to determine which scale preponderated; that it could not be said to be a verdict against evidence, and so refused to grant a new trial. The same rule was adopted in the case of Smith v. Huggins, 2 Strange, 1142, and a new trial de> *305 nied, although the evidence -was weak on the part of the plaintiff, and the judge who tried the cause strongly inclined against the verdict.
I am, therefore, of opinion, on the first point, that a new trial ought not to be granted.
With respect to the second question, I think there can be but little difficulty. There is no doubt but the real destination *of this vessel was for New York, [*237] as described in the policy, and not for Falmouth, as the clearance purported. There is no contradictory testimony on that subject, except, that in the first protest it is said, as in the clearance, she sailed for Falmouth and a market, but as to the actual place of destination of a vessel, I think the captain, unless his testimony is impeached, is entitled to full credit. He, of all others, is the most likely to know this fact; and he, when examined as to that point particularly, declares explicitly, that she sailed for New York, though her clearance was for Falmouth and a market ; and in this he stands corroborated by the testimony of Alexander Anderson, the plaintiff’s agent at Honduras. I, therefore, take it for granted, that the vessel sailed on the voyage insured. So far as any reasons could be discovered for taking out a clearance for Falmouth, it was to avoid the payment of certain charges, that would otherwise have been incurred at Honduras. There was no warranty or representation, and it has been settled in this court in the case of Murray v. United Insurance Company, (July term, 1800,) that in such cases, the underwriters take upon themselves war risks. Under a policy of this description, I cannot conceive how this clearance could, in any manner, prejudice the underwriter, or increase the risk; and, therefore, immaterial whether disclosed or not. In all the cases cited from Bobinson’s Adm. Bep., where false and color-able papers came under consideration, the question was, as to the neutrality of the property; the papers purporting a different voyage or owners from the other testimony, and so considered a circumstance of fraud and suspicion. But *306 as the present insurance is general, and includes war risks, this clearance was immaterial.
I am, therefore, of opinion that judgment ought to be rendered for the plaintiff upon the verdict of the jury.
Radcliff, J.
On the trial of this cause, the defendant rested his defence principally on the want of seaworthiness. This objection was relied upon in the argument for a new trial, and two other grounds were also taken, viz:
1. That the ship sailed from Honduras for Falmouth, and rot on the voyage insured.
2. That there was not a sufficient disclosure.
*I shall begin with considering the two points last mentioned.
As to the first of these, the evidence is, that the ship cleared at Honduras for Falmouth and a market. The captain and mate, and one of the seamen, who made the original protest, therein swore, that they sailed from Honduras, bound for Falmouth and a market. On this evidence alone, I should have no doubt that the voyage from Honduras ought to be considered as destined for Falmouth. But the captain, in his second protest, explained that he in fact sailed for Hew York, although he cleared for Falmouth. How far this explanation can be reconciled with his former deposition in the first protest, or ought to be received without further proof to establish the fact of his sailing for Hew York, it is not important, under the circumstances of the present case, to decide. There is other evidence, to wit, the deposition of Alexander Anderson, and the letter of the plaintiff of the 3d of October, 1799, explaining the object of the clearance for Falmouth, which I think sufficient to justify the verdict, on the ground that the vessel actually sailed for Hew York.
2. Assuming the • position, that the vessel was in fact bound for Hew York; the second point has been treated as more delicate and important. She was bound for Hew York, but cleared for Falmouth. It is not stated in the *307 case whether the cargo was consigned to any person at New York, nor in what manner her other papers appeared." The objection is, therefore, founded on the clearance alone.
In considering this question, it is material to observe, that the insurance was general, without any warranty or representation that the property was neutral. It follows, according to the decision of this court, in the case of Murray v. United Insurance Company, that it extended to protect belligerent as well as neutral property. If the risk, therefore, was not increased beyond what it would have been in the case of belligerent property, the circumstance t f a false paper, or a clearance for a port of one of the nations at war, could not be material. The underwriter must be deemed to have received the premium adequate to the risk, which this circumstance implies, and *ought, therefore, to be liable. Besides, I think [*239] it too uncertain, and too great a refinement, to establish a rule that every paper, which, in the opinion of the cruisers of a belligerent nation, may be deemed suspi clous, and induce them to carry in a vessel for adjudication, should be held necessary to be disclosed. It would be impossible to meet the ingenuity, or avoid the cupidity of that class of men, and prescribe a safe and practical rule on the subject.
3d. On the point of seaworthiness, there was much contrariety of evidence.
On the part of the defendant there appeared,—
1st. A survey of the vessel, made on her arrival at Honduras, by eight persons, at the instance of the captain, who certified, upon oath, that she was wholly defective in her timbers aloft, her "upper works, inside and out, plank rotten, and otherwise generally decayed; that on account of these defects, and other injuries which she had received, she was, in their opinion, unsea worthy; and, from the difficulty of procuring workmen and materials, and the high price of labor and provisions, she was incapable of being *308 repaired for her full value after the repairs should be completed.
2d. The depositions of four of the -above persons, who made the survey, taken under a commission, who testify, generally, to the same effect. Three of them add, that they verily believe .it was impossible the ship could have been seaworthy on the 21st of November, 1799, at which time she commenced the voyage insured. Two of the three last mentioned witnesses are ship-carpenters, and the third a mariner. The fourth is a merchant, and speaks with more diffidence of his knowledge of vessels, but says, that he firmly believes that some of her timbers had been rotten a long time.
In opposition to this the plaintiff produced,—
1st. The protest of E. Atkinson, the master, of the chief mate and one seaman, who swore, that when they sailed from Honduras, on the 27th of January, they firmly believed the ship was tight, staunch, and well fitted and provided for the voyage. The master, in a supplementary protest, again positively declared, that she was tight, staunch and strong, and well fitted for sea.
*2d. A deposition of Andrew Dorgan, who testified that he had been master of the ship immediately before the plaintiff purchased her, for the period of fourteen months; that during that time she was twice hove down and examined, and none of her timbers were found rotten or defective; that during all the time he sailed in her, he thought her as strong, staunch, and good a vessel as any he had ever sailed in, and when he left her, which was in April, 1799, she was, in his opinion, fit to go to any part of the world.
3d. The testimony of Thomas Williams, examined at the trial, and the deposition of William Peacock/ two ship-carpenters of the city of New York. They examined the ship at the request of the plaintiff, previous to the purchase by him, in April, 1799, and reported her to be generally a sound and strong ship; after the purchase, they made some *309 repairs to her, fitted her for sea, and had a full opportunity then to ascertain her real condition; they add, everything was done which was necessary to render her seaworthy,, and that, after such repairs, she was perfectly sound in all her parts, and fit for any voyage. One-of these witnesses, Thomas Williams, also said, that from the state of the ship when he repaired her in April, 1799, it was impossible she could be so decayed at the time of the survey at Honduras, as was represented by the surveyors there, and that, in his opinion, they must have sworn falsely.
4th. The testimony of Samuel Middleton, and one Bird, the plaintiff’s clerk. The first of these proved, that he helped to repair the ship in the year 1795, and, from her condition at that time, he was fully of opinion that she could not have been so rotten as was stated in the survey, and the evidence taken at Honduras. Bird, the plaintiff’s clerk, established, that the charges of the ship, after the purchase, and including her outfits, amounted to 3,040 dollars, and that the purchase-money was 5,000 dollars. He could not distinguish how much was expended for the repairs alone.
The defendant also produced one Rose, a witness, who was a captain of a ship, and had been often at Honduras since the year 1795. He testified that William Gibson, one of the surveyors, was a respectable merchant, and treasurer *of the settlement; that Thomas [*241] Potts, another of the surveyors, was one of the richest merchants there, but he knew nothing particularly respecting him. That he was acquainted with two of the other surveyors, but could say nothing of their character. This witness also said, that the vessel must have been very strong to carry the sail described in the protest, with a hard north wind, and he thought she could not havb done it if the wind had been very high. Two other witnesses, judging from the sail she carried, also testified that in their opinion the weather could not have been so violent as to injure a sound and strong vessel.
*310 This was the principal evidence concerning the question of seaworthiness which was submitted to the jury as a fact to be determined by them. As that fact appears to have been generally submitted, I think it not material to examine the substance of the charge in other respects. But J take this opportunity to observe, that the opinions and directions of judges at the circuits, as made by the parties, appear, too frequently, very different, both in form and substance, from what they really were.
In the present case from the face of the charge, and the simple nature of the question under consideration, it is manifest, that it can neither be correct nor entire. This, however, appears to me unessential to the decision of the question between these parties. I view it as a question depending on the weight of contradictory evidence. The witnesses at Honduras had, do doubt, the best opportunity for correct information. They saw the vessel immediately after the disaster happened and examined her. They could not be mistaken in their knowledge of the fact, whether she was so rotten or decayed as they have represented, and if they speak the truth, she must have been extremely deficient and unseaworthy.
On the other hand, it is difficult to reconcile their evidence with the testimony of the plaintiff’s witnesses. The depositions of Dorgan and the two ship-carpenters in the city of Hew York, prove,-that the vessel at, and shortly before, the time she left that port, was apparently seaworthy, and in a condition which it seems impossible [*242] could admit *of so great a decay in the period of seven month s, at th e expiration of which the voyage in question commenced.' These, and other parts of the testimony, appear to me irreconcilable. If the question is to be decided on the credit of the witnesses merely, and there'be nothing to impeach those on either side, the greatest number testify to the fact that the vessel was unseaworthy. These were witnesses residing at Honduras. That circumstance, and the want of a sufficient knowledge of their *311 character and credibility, have been urged against allowing much weight to their testimony, when in competition with other proof. But if there be any general reason to discredit the witnesses abroad, other circumstances, in this instance, operate in their favor.
1st. As has been already observed, they possessed better means of information. They examined the ship immediately after the accident happened. The examination of the two ship-carpenters in Hew York, from its nature, must have been more superficial, and it took place seven months before the vessel sailed on the voyage insured.
2d. In the captain’s protest no cause is stated adequate to the injuries described. A sound ship, under the circumstances therein set forth, could not, in all probability, have been so injured. It does not appear that any material accident happened; no external injury was suffered ; not a spar nor a sail was carried aivay, although a considerable press of sail was sometimes used. I do not perceive that anything more is represented to have happened than what might be expected on such a voyage, and what a ship ought to be competent to encounter.
3d. The captain, in his protest, swears in general terms, without designating the particular injuries sustained, and refers to the survey at Honduras, which contradicts his testimony.
Heither he nor any of the crew were examined at the trial, and no reason has been given why they were not produced. I think it was to be expected from the plaintiff to produce them, andxby their testimony it was in his power to throw further light on the subject.
There is great reason to doubt the propriety of the verdict, and, considering the value in controversy, and that %nore light can probably be obtained, I think [*243] the cause ought to be reviewed. The circumstance that here was a struck jury, is not of decisive weight in favor of the verdict, especially as it is founded on a point *312 against- which, as a ground of defence, it is known considerable prejudice exists.
I am, therefore of opinion, that there ought to be a new • trial on the question whether the ship was seaworthy.
Kent, J.
The ship cleared out for Falmouth instead of Kew York. The clearance was for Falmouth and a market, although the ship was actually bound for Kew York. She was loaded with mahogany at Honduras, and cleared from there and in sixteen days after she sailed, she returned in distress.
I state no more of the testimony in the case, because the fact's stated are sufficient for the only point which I heard argued in the cause, and on which I give my opinion, viz. whether there ought to have been a disclosure that the ship cleared for a different port than the one she ivas bound to ?
In this ease, the insurance was in time of war; but the case does not state that there was any warranty, or representation that the property was neutral, and we are to intend therefore, that there was none. The insurer, according to the decision in the case of Murray v. United Insurance Company, (July term, 1800,) took upon himself the risk of enemy's property. The non-disclosure of the clearance for Falmouth could not, then, in any .possible view, be material for the disclosure of the fact (if at all material) could only have been so, as it affected the neutrality of the vessel.
On, this point, therefore, I am for the plaintiff, and that the verdict ought to stand.
Lewis, Ch. J.
An application is made to set aside the verdict in this cause, and for a new trial. Three questions are raised for the consideration of the court:
1st. Did not the ship sail on a voyage different from that insured?
2d. Ought not the fact of her clearance for Falmouth and a market, pursuant to the orders of the plaintiff, of the 3d *313 of October, 1799, to have been disclosed to the underwriter ?
*3d. Is not the verdict against evidence on the [*244] point of the ship's competent sanity to perform the voyage insured ?
The first question is raised on the tact of the Hope’s having cleared from Honduras for Falmouth and a market, when the insurance was for Hew York.
This would be a circumstance of some weight were it connected with others tending to show that the real intention was a voyage immediately from Honduras to Falmouth, but cannot per se, be sufficient evidence of that fact, and certainly cannot be permitted to control the counter testimony, which establishes, beyond doubt, that her real destination was for Hew York, and that the clearance for Falmouth and a market was probably for the purpose of saving certain duties, in the event of the cargo ultimately finding a market at a British port. Her consignee at Honduras, from his correspondence with the plaintiff, understod Hew York to be her destination, and wrote letters by her to his correspondents here. The letter of the plaintiff to tire captain, containing the instruction as to his clearance, directs him, in the same period, to return direct from Honduras to Hew York, as before ordered. The expressions are, “ although you are to return direct from Honduras to this place, (viz. Hew York,) as before ordered, you will clear out the vessel from Honduras to Falmouth and a market.” This, in my opinion, establishes beyond controversy, that Hew York was the port she was bound to. The first protest of the master, mate, and one of the seamen, ‘n which the ship is stated to have been bound to Falmouth and a market is a circumstance almost too slight to be noticed ; for I have observed it a practice, without variation, for the protest, in this respect, to be made according to the clearance, without regard to the true place of destination. In the second protest the master states, he sailed for Hew *314 York, though cleared for Falmouth, thus correcting his statement, when he discovered the fact to be material.
If there is any substantial distinction between the cases of Planche and another v. Fletcher, Mayne v. Walter, (Doug. 238, Park, 195,) and the present case, it is favorable to the last. In the two first, the vessels cleared for an intermediate port, at which they had leave to touch, the [*245] policy continuing to *their arrival at the ultimate port of destination ; in this the policy would have terminated on her arrival at an intermediate port, though she might afterwards have proceeded under her original clearance for Falmouth.
The next question is, whether the fact of the clearance for Falmouth ought to have been disclosed to the underwriter. It is not contended that the concealment was fraudulent ; and in order to render it a circumstance affecting the policy,, it ought to appear material to the risk. The only guide we have on this occasion leads to a contrary result, There cannot be a surer test of the materiality of a concealed circumstance, than its influence, if known, on the rate of premium.
The Hew York Insurance Company were also on this risk, and, near two months after subscribing the policy, assented, without additional premium, that it should not be affected by the circumstance of the ship Hope having cleared out for Falmouth instead of Hew York.
This company must be presumed to understand its interests, and their conduct on this occasion is decisive, that the fact concealed was immaterial to the risk, and therefore the policy is not affected by it.(a)
*315 [The third and last question is on the seaworthiness of the ship. On the argument a novel position was advanced, ■viz. that latent defects are at the risk of the underwriter; that they are covered by the premium, because he calculates chances according to losses. My first impression, I confess, was favorable to its correctness, notwithstanding the force of authority against it. But on examination I was satisfied, that although in part true in point of fact, it is nevertheless. unsound in principle. It is true that losses are the basis on which the underwriter calculates the chances of loss and gain. But it is equally true that his not being answerable for inherent defect, or natural decay, diminishes the number of losses, and thus reduces the chances against him. The implied warranty, then, on the part of the as ■ sured, that the ship is tight, staunch and strong, and well equipped, &c. remains unimpeached, and on the fact of this warranty having been complied with, on the present occasion, rests the question between the parties.//
*The judge before whom the cause was tried, [*246] is, in the case made, stated to have instructed the jury “ that by law every vessel is presumed to he seaworthy/ This I presume to be not perfectly correct, or, in other words, that the instruction ought to have been less general or rather, more precise. [Every vessel is presumed to be seaworthy in the first instance, in respect to the implied warranty only; because the law will not, without cause, presume a party to have falsified his stipulation. But the instant she becomes innavigable, and incapable of proceeding on the voyage insured, the presumption is, that this proceeds from age or internal defect, arising from some other cause, until it appear to have been the effect of sea damage, or unforeseen accident insured against, And with reason is it so; for the insurer engages against extraordinary and unforeseen perils of the sea. And this he docs, in the confidence that the ship is capable of performing the *316 voyage, and assuring to him his premium, ordinary occurrences notwithstanding.
I am strongly inclined to believe that the verdict of the jury in this cause, was owing to the generality of this instruction. That relying too firmly on the presumption, as the reinstated, they sought for positive and conclusive evidence to the contrary, thereby losing sight of the presumption arising from the want of evidence of external accident, and not duly appreciating the testimony taken under the commission at Honduras, as & the real cause of condemnation.
The vessel is stated to have been nine or ten years old at the time of the insurance being made; to have been * thoroughly repaired in 1795, examined in April, 1799, previous to the purchase of her by the plaintiff; afterwards repaired by the examiners, Williams and Peacock, two ship-carpenters, and purchased on their report. They state, that after her last repair, she was fit for a voyage to any part of the world. This testimony is corroborated by that of Captain Dorgan, who commanded her at the time she was purchased by the plaintiff. There is, however, a variance between his testimony and that of the two ship-carpenters. He testifies that she was twice hove down within four-[*247] teen months previous to the sale, some of *her planks ripped off, and her timbers examined, none of which were rotten or defective. Williams and Peacock, the ship-carpenters who repaired her, admit that some of her planks and timbers were tainted, which Williams says were mended, and Peacock, that they were replaced with new.
In opposition to this is the testimony of Hicholl and Tropp, ship-carpenters, and Potts, a master of a vessel, who examined her on her return to Honduras, who testify, that '•two thirds of her timbers were rotten, several of her planks and her bends rotten and. started. This testimony is corroborated by that of Mr. Gibson, who is proved to be a merchant of respectability there, and treasurer of the settlement. He professes to know little of a ship, but de *317 dares that many of her planks were rotten, and several of her timbers so much so as to crumble to pieces when struck with a crow bar.
These witnesses may be said to be interested in her condemnation. The fact may be so. But surely such interest was not greater than that of Williams and Peacock, who probably, had they discovered or disclosed too many defects in her, would have deterred the plaintiff from purchasing, and thus lost the job of repairing her.
She does not appear to have met with any weather that could have effected a sound ship; yet, she made so much water that the master was obliged to return into port. And it is a little singular that if this was the effect of any other cause than natural decay, that it was not stated by the master or some one of the mariners. .It is true, that in his second protest, he speaks of her having experienced heavy gales and various changes of weather, and yet not a spar is carried away, no butt started, no sheathing torn off. Surely a vessel tight, staunch and strong could not have been rendered innavigable by gales that did not require the striking of a top-gallant-mast; for we find the top-gallant-masts and yards standing until the third of February, a day after that on which, by the advice of his crew, he had borne away for a place of safety. He speaks of strong gales on'the 28th of January, and yet the top-gallant-sails were not handed until midnight. Where is the evidence, then, of external injury? There is none, nothing that looks towards this point, except his declaration, *that on the survey, the damage of the [*248] ship was found to have proceeded from the hard gales, in which they were obliged to carry an unsual pressure of sail, as (says he) is more particularly set forth in the survey; now the survey says directly the reverse, and corresponds precisely with the depositions of the witnesses on the part of the defendant.
I think the testimony will warrant no other conclusion than that she died a natural death. This opinion I found *318 on the fact of no extraordinary peril having been incurred, and on the testimony taken at Honduras, which I think is to be-preferred to that taken here; those searching for an infirmity, known to exist somewhere, were more likely to discover defects than these, who gave her a cursory examination for the purpose of recommending her to a purchaser, and of repairing such defects as occasionally fell under their observation.
The cases of Lee v. Beach and of the Mills frigate, were attended with circumstances much more favorable to the owners than the present case. In the former, the vessel had been, as was supposed, completely repaired immediately before sailing from the Thames, and was discovered to be unsound before she reached Portsmouth. In the other, the ship had not only been put into dock and repaired, previous- to her departure on her outward bound voyage to the West Indies, but was, while there, again surveyed by six sea cap tains,, and reported to want caulking only, when she would be sufficient to carry a cargo of sugars to London. Yet, in both these cases, were the underwriters discharged on the point of seaworthiness. 2 Marsh.368; Park, 221.
I am of opinion, the verdict ought to be set a side, and a new trial awarded on payment of costs.(a)
Livingston, J.
having been concerned in the cause, gave no opinion.
On the point of seaworthiness, new trial granted.

 Where there is no warranty of neutrality, nor any character of the yessel, the insurer takes all risks, belligerent as well as neutral. Siting and mothers. Scott & Seaman 2 Johns. Rep. 157. A disclosure, therefore, of the clearance, perfectly nugatory. If a policy be in general terms, “ on goods on board the ship coled the “Hermon,” without any addition of country, and not represented as of any particular country at the time of signing the policy, it is not necessary that she be furnished with documents in conformity to *315 treaties between a foreign state and her own nation. Davison v. Atty, 1 Bast, SST.

 The principle of this decision, as to tile effect of a clearance to a port different from that of destination, has been confirmed in the case of Takot v. Marine Insurance Company, 2 Johns. Rep. 130. It was there held not to make the voyage different from that insured, when done to avoid cruisers; and that the statement of the master in his protest, that the voyage was to the port for which he cleared, was equally inefficient, if the reason for so doing was explained. As to concealment, see Ely v. Hallett, 2 Caines’ Rep. 60. n.