## DANIEL DESHON *vs.* THE MERCHANTS' INSURANCE COMPANY.

D. and H. made an oral agreement for the purchase and shipment by D. of a cargo for H.: After the cargo was purchased and shipped by D., and the vessel had sail-d, D.'s clerk, for the purpose of having something " to show the character of the transaction," wrote a letter to D., dated before the purchase and shipment were made, and procured H. to sign it, requesting D. to purchase and ship a cargo for H., and giving directions as to the disposal of the same : D. gave no written assent to the terms of this letter. *Held*, that the letter was not a com mitting to writing of the agreement between D. and H., but was a mere memorandum, intended by the clerk to preserve, in substance, the outline of the agreement which had been made; and that parol evidence was admissible to show the agreement, and the relation of the parties thereto before the sailing of the vessel.

The stowing on deck of all the water on board a vessel, contrary to the requisition of the United States *St.* 1790, *c.* 56, § 9, does not, of itself, render the vessel unseaworthy, nor shift upon the assured the burden of proving her seaworthy.

A witness cannot be allowed, for the purpose of strengthening his testimony, to state, on his examination in chief, that he had previously communicated to others the same facts to which he has testified, or other particular facts.

ASSUMPSIT on a policy of insurance, dated June 28th 1843, whereby the defendants caused the plaintiff, for whom it might concern, payable to the plaintiff, " to be insured, lost or not lost, $6000, on merchandize and specie, viz. $3000 on merchandize, and $3000 on specie, on board schooner Drusilla, at and from Boston to port or ports in Hayti ; also on some property or investment thereof on board said schooner at and thence to Boston."

One count in the declaration averred a joint interest of the plaintiff and Peter P. Hutchins in the subject of the insurance ; another count alleged a separate interest in the plaintiff, and the third alleged a separate interest in Hutchins.

The trial was before *Shaw,* C. J. who made the following report of it : The policy and notice of loss and abandonment were not contested. Proof was offered to show a loss of the insured property by fire, a few days after the schooner sailed. To prove the plaintiff's interest, he called, as witness, David S Stackpole, a clerk who was employed by him in June 1843. This witness verified the invoice of the cargo shipped on board the schooner, and the bill of lading, and testified to the purchase, by the plaintiff, of the merchandize which composed the cargo, and the shipment thereof, together with $3000 in specie, on board the schooner, on the 30th of June 1843. He also testified to the following letter of Hutchins to the plaintiff : " Boston, June 28th 1843. Daniel Deshon, Esq. Dear Sir : You will please purchase and put on board the Drusilla, for my account, for shipment to a port in Cape Hayti, such cargo as you may deem it advisable, and consign the same to your friends there, with directions to invest the proceeds of sales of such cargo in coffee, to be consigned to your address. On the purchase of the outward cargo, you are to charge a commission of $2\frac{1}{2}$ per cent., and on the sales of the return cargo a commission of $2\frac{1}{2}$ per cent., and for guaranty the same. You will please make insurance on the same, sufficient to cover in case of loss, and on vessel $1200, valuing the same at $2000. Yours respectfully,

Peter P. Hutchins."

This letter was written by the witness, after the schooner sailed, and signed by Hutchins, to be left with the plaintiff. The object of the letter, as the witness stated, was, to have something to show the character of the transaction.

The witness being inquired of what was the contract between the plaintiff and Hutchins, the owner of the schooner, as to the purchase and shipment of the cargo, it was objected that parol evidence ought not to be admitted, to prove this

contract, because it was proved by writing, as contained in the invoice, bill of lading, the abovementioned letter of Hutchins to the plaintiff, and also a letter of instructions given by the plaintiff to the master of the schooner. But the objection was overruled, and the witness further testified as follows: "I heard the bargain. Hutchins asked Deshon to purchase a cargo, ship it in his own name, and consign it to his friends in Port au Prince, the proceeds to be invested in coffee and come back to Deshon's address. The return cargo was to include the proceeds of the sale of the outward cargo and of the specie; Deshon to have the possession and control of the cargo, and Hutchins to be interested in the profit or loss of the voyage; he was to receive all profit over and above the cost and charges and Deshon's commissions; and he was to sustain the loss, if any occurred. The captain was to be under Deshon's directions, as to the sales of the property in Hayti; and Deshon purchased and selected the cargo here. He purchased the whole cargo and paid for it. Hutchins agreed to place a certain amount of money to go with the cargo, to be invested in a return cargo, as collateral security, and to indemnify Deshon against any loss which might arise. Deshon did in fact furnish part of the specie placed on board, and it was afterwards made up by Hutchins, after the vessel sailed, and placed to his credit in account."

It appeared by the testimony of Henry E. Jenks, master of the schooner, who was called as a witness by the plaintiff, that all the water on board was stowed on deck. It was contended by the defendants, that the vessel was, on that account, unseaworthy. It was ruled by the judge, that it was the duty of the owner to have on board a sufficient quantity of fresh water, well secured; otherwise, that the vessel was not seaworthy; that the fact of all the water being stowed on deck did not necessarily render the vessel unseaworthy, but that it was a question of fact for the jury, upon the evidence, taking into consideration the number of the officers and crew, the destination of the vessel and the length of the voyage, and also the quantity of water on board and the

manner of its stowage, whether the vessel was seaworthy for
the voyage.    And as to the burden of proof, it was ruled that
it was matter of defence that the vessel was unseaworthy on
this account, and must be proved by the defendants.

The main ground of defence was, that the loss was not a
fair loss; that the schooner was designedly destroyed by the
procurement and management of Hutchins, the owner, for
whose account, in whole or in part, this policy was made.
Evidence, particularly the testimony of Edward Thomas,
taken by deposition, was offered upon that subject.   He was
offered as a witness who would not be entitled to full credit,
but whose testimony would be to some extent corroborated
and supported, so as to have weight with the jury.    The 8th
interrogatory put to this witness was thus :   " After the
Drusilla sailed from Boston, in the summer of 1843, did you
communicate to any person that she was to be burned or
destroyed, and to whom did you make such communication,
and when was such communication made, as nearly as you
can recollect ?   If you cannot fix the day precisely, was it
before or after the news of the loss of the vessel reached
Boston, that you made such disclosure ? "    The answer of
the witness was, " I did communicate the fact that she was
to be destroyed, as I believed, to Mr. D. Clapp and Mr. Titus
Welles.    The Drusilla, I think, sailed from Boston on a Sat-
urday night, and on the following Tuesday or Wednesday, I
made the communication to these gentlemen of my convic-
tion that said vessel was to be destroyed.   I am sure I made
the communication just spoken of before any news of the
destruction of the Drusilla had reached Boston, and I think
some three or four days previously thereto."   When this inter-
rogatory and the answer were about to be read, they were
objected to by the plaintiff, on the ground that it was pro-
posed to sustain the credit of the witness, by his own testi-
mony, before it was impeached, and that this was not admis-
sible.    Whereupon it was decided that said interrogatory and
answer could not be read then ; that if it should become a
material fact, that the witness declared his knowledge to

other persons, and such persons should be called to testify to it, this decision would not preclude such evidence when offered; that it might stand on a different footing; that the evidence was offered to support the deponent's own credit, for which purpose it was inadmissible.

A verdict was thereupon taken, by consent, for the plaintiff, subject to the opinion of the whole court upon the points thus decided.

*B. R. Curtis*, for the defendants. 1. The terms of Hutchins's letter to the plaintiff, though it was written after the oral contract was concluded, were accepted as the terms of that contract, and they cannot be varied by parol. *Richardson* v. *Hooper*, 13 Pick. 446.

2. In the absence of all evidence, the burden of proof of unseaworthiness is on the underwriters. But after proof was made that all the water was on deck, the burden was on the plaintiff. *Watson* v. *Clark*, 1 Dow, 344. *Douglas* v. *Scougall*, 4 Dow, 277. *Barnewall* v. *Church*, 1 Caines, 234, 246. The general rule is, that a policy on goods, in general terms, on board a vessel, does not cover goods laden on deck; because goods on deck are in greater hazard than goods under the deck. *Taunton Copper Co.* v. *Merchants' Ins. Co.* 22 Pick. 108. The United States *St.* 1790, c. 56, § 9, requires that every ship or vessel, bound across the Atlantic Ocean, shall have on board, well secured under deck, at least sixty gallons of water for every person on board, and in like proportion for shorter or longer voyages. If putting the water on deck is not *per se* unseaworthiness, yet it rebuts the presumption of seaworthiness.

3. The statements made by a person when not under oath, as a general rule, are not to be received to corroborate his statements as a witness. But there are exceptions to this rule; as where he is impeached by adversary testimony, or upon cross-examination, or even upon direct examination, when he admits that he was an accomplice in the offence of which he testifies that another is guilty. *The People* v. *Vane*. 12 Wend. 78. *The State* v *De Wolf*, 8 Connect 93.

*Cooke* v. *Curtis*, 6 Har. & Johns. 93. *The State* v. *Twitty*, 2·Hawks, 449. The judge, at the trial, did not deny these cases, but he held that the witness himself should not be allowed to testify that he had made similar statements on former occasions. The peculiar circumstances of the case at bar seem to require that the witness himself should have been permitted to answer the 8th interrogatory. The question was, whether there was a fraudulent contrivance to destroy the vessel; and the defendants had a right to every thing from the witness, which would bear on the facts in issue.

*H. H. Fuller & Choate*, for the plaintiff. 1. The parol evidence was rightly received. There was no written contract, and the testimony only proves that the plaintiff accepted the overture of Hutchins, whose letter was a mere overture or proposition, on which he could not have been sued by the plaintiff for a breach of contract. 1 Greenl. on Ev. §§ 275, 279. 3 Phil. Ev. (4th Amer. ed.) 1471 – 1473.

2. The judge ruled that the mere stowing of the water on deck did not render the vessel unseaworthy. And this had been before decided in *Warren* v. *Manufacturers' Ins Co.* 13 Pick. 518. If that decision is correct, it follows of course that the· burden of showing that the vessel was seaworthy was not shifted upon the plaintiff. *Powers* v. *Russell*, 13 Pick. 76. Seaworthiness is a pure question of fact for the jury. In the cases cited for the defendants, on this point, the court did not decide what proved unseaworthiness, but held that it might be legally inferred from the bad condition of the vessel, immediately after sailing, without any apparent cause subsequently arising. 2 Greenl. on Ev. § 401.

3. The answer of Thomas to the 8th interrogatory was properly excluded. The interrogatory was put before the witness was impeached; and a witness can never be supported by evidence in chief. Evidence in support of a witness is admissible only in reply to an impeachment of him. *Jackson* v. *Etz*, 5 Cow. 314, 320. *Howe* v. *Thayer*, 17 Pick. 91. But if the witness had been previously impeached, he could

not be supported by evidence, even of other witnesses, of his having before made the same statements ; *a fortiori*, not by his own declaration that he had so done. 1 Greenl. on Ev. § 469. Roscoe on Ev. 96. *The King* v. *Parker*, 3 Doug. 242, denying that *Lutterell* v. *Reynell*, 1 Mod. 283, was law. *Ware* v. *Ware*, 8 Greenl. 42. *Craig* v. *Craig*, 5 Rawle, 91. *Munson* v. *Hastings*, 12 Verm. 346. *Gibbs* v. *Linsley*, 13 Verm. 208. 1 Phil. Ev. (4th Amer. ed.) 307, 308. 2 ib. 776 – 778.

HUBBARD, J. It is contended that the invoice of the cargo, the bill of lading, the letter to the master, and the letter of Hutchins, the owner, to Deshon, constitute together the whole contract between Hutchins and Deshon, and consequently that the evidence of the clerk was improperly admitted on the trial, as violating the rule of law respecting the construction of written contracts.

It is very clear that the first three named papers are but documents growing out of the contract ; and the question is, whether the letter of Hutchins, when written, was intended to be a reducing of the contract itself to writing, or was meant as a memorandum of the principal matters constituting the existing oral contract between the parties. To enable us to form a correct conclusion, it is necessary not only to consider the letter, but the circumstances under which it was written. The letter, if read according to its apparent date, is but a proposition of Hutchins to Deshon to undertake a certain agency for him, and giving directions in regard to it ; and of itself it is not an instrument upon which an action could be maintained as upon an executory agreement. An assent by Deshon to the precise terms proposed must be shown, before it can constitute a contract between them. Such assent is not shown in writing, and we are therefore at liberty to inquire under what circumstances the letter was written. And it appears from the testimony of the clerk, that the letter is in his hand writing, and, though it bears date June 28th, that it was not in fact written till after the vessel sailed with the cargo which was the subject of the contract

It would seem that it was written at the instance of the clerk himself, and not at the request of Deshon; and the clerk expressly states that the object of the letter was to have something to show the character of the transaction. Upon this evidence, we are, upon the whole, satisfied that it was not a committing of the contract of Hutchins and Deshon to writing, but was a mere memorandum, inartificially drawn, and intended by the clerk to preserve in substance the outline of the contract which had been made. It is a mere piece of evidence, and is not the contract itself, which was by parol, and was partially executed before the letter appears to have been thought of. Under this view of the facts, we think the parol testimony was properly admitted to show the contract and the nature of the relation between the parties, prior to the sailing of the vessel.

The next question raised by the report is, whether the ruling of the presiding judge was correct, in respect to the seaworthiness of the vessel for the voyage insured. It appeared in evidence, that all the water on board the vessel was stowed on deck, and it was contended by the defendants, that the vessel was on that account unseaworthy; and on this point, as to the burden of proof, it was ruled that it was matter of defence that the vessel was unseaworthy for this cause, and must be proved by the defendants.

It is argued by the counsel for the defendants, that in the absence of all proof, unseaworthiness is not to be presumed, but when the question arises, upon whom is the burden of proof to show the unseaworthiness of the vessel? then it rests with the assured, and he must show it; that in this case, there is a departure from the usual mode of stowing water, a mode contrary to the statute of the United States on the subject; a departure which increases the ordinary risk; and therefore, the plaintiff not being supported by the ordinary presumption of seaworthiness, the burden is on him to show that the vessel was seaworthy. The case of *Watson* v. *Clark*, 1 Dow, 344, was cited, to show that the *onus probandi* is on the plaintiff, on the point of seaworthiness. See also *Barnewall* v. *Church*, 1 Caines, 234.

The law is well settled, and upon the soundest principles, that the seaworthiness of the vessel for the voyage insured is a warranty on the part of the assured, and a condition precedent to the attaching of the contract. The insurance is against the extraordinary perils to which the vessel is exposed, and not against ordinary hazards. An unseaworthy vessel is not fitted to bear these ordinary hazards, and therefore is not the fair subject of the contract. But a usage has existed in this Commonwealth, for a long course of years, that although the seaworthiness is a matter of warranty on the part of the assured, and must necessarily be complied with, yet he is not called upon, *in limine,* to give evidence of his having complied with it. It is assumed as a fact, in the absence of fraud, and he has the benefit of the presumption. If the underwriter, therefore, rests his defence on the breach of this warranty, he is required, in the first instance, to offer evidence tending to establish it, either by direct proof of the fact, or as a fact following by necessary inference from other facts ; as where a vessel, immediately after her first sailing upon the voyage insured, without encountering any storm, or taking the bottom, or running foul of another vessel, should spring a leak and sink. The assured will then find it necessary, because the weight of evidence is against him, to rebut the presumption, and to establish, by competent proofs, the seaworthiness of the vessel. But where a vessel sails on the voyage insured, and is never heard from, the fact of seaworthiness is presumed, and the assured has the benefit of it, in the absence of proof to the contrary. In the case cited from 1 Dow, 344, Lord Eldon says, " when the inability of the ship to perform a voyage became evident, in a short time from the commencement of the risk, the presumption was, that it was from causes existing before her setting sail on her intended voyage, and that the ship was then not seaworthy ; and the *onus probandi,* in such a case, rested with the assured, to show that the inability arose from causes subsequent to the commencement of the voyage." The doctrine here laid down is not in fact contradictory to the law as practised upon in this

Commonwealth ; but the use of the terms "*onus probandi*" may be calculated to mislead. It is not, however, there asserted that the burden of proof is originally on the assured to establish by evidence the seaworthiness of the vessel, but that, in the absence of other causes, and an adequate cause of loss being shown, arising from unseaworthiness, he is then called upon effectually to rebut it, or the warranty will be held to have been broken ; which is nothing more than that, the weight of evidence being against him, he must control it by other evidence, or suffer the consequence that will follow from the want of it. And so in no case can the assured ever recover upon legal grounds, without showing the existence of a peril insured against, to which the vessel has been exposed, and which was adequate to cause the loss ; otherwise, the underwriter would be often required to pay for losses occasioned by unseaworthiness. In the present case, an adequate cause of loss existed by a peril insured against. But this cannot avail the owner, if the vessel was not protected by the policy ; in other words, if she was not seaworthy when she sailed on the voyage insured ; but the defendants must show that fact, in order to defeat the plaintiff's claim.

In the case of water for the service of the ship's company, the ship must have a sufficient quantity, in suitable casks or vessels, and properly stowed and secured on board the ship. But the mere fact of its being all carried on deck does not of itself, as matter of law, render the vessel unseaworthy. If it were so, there would be nothing for the jury to settle. It is a fact tending to prove unseaworthiness ; yet, standing alone, it is not necessarily unseaworthiness. It is not like the case of a vessel sailing without anchors, or a competent crew to navigate her, which in themselves constitute unseaworthiness. It is not a fact which in itself shifts the burden of proof ; or, to speak more correctly, it does not so materially affect the condition of the vessel as to its seaworthiness, as to require the plaintiff to support his case by opposite proofs, to prevent the conclusion, in the absence of such proofs, that the vessel was

unseaworthy from that cause alone. The United States *St.* 1790, *c.* 56, § 9, imposing a penalty for not carrying a part of the water under deck, does not, as between the parties, constitute a case of unseaworthiness. That question was considered and settled in this court, in the case of *Warren* v. *Manufacturers' Ins. Co.* 13 Pick. 518.

The statute of the United States on this subject is, in my judgment, a most wise and salutary one, and though, prior to that decision, I was of opinion that a vessel was not seaworthy which did not carry a part of the water secured under deck, yet the above cited case has decided the point that a vessel is not necessarily unseaworthy on that account, and that the same is a matter of evidence, being a question of fact to be settled by the jury. The defendants, therefore, could not rely on the mere existence of the fact as a proof of unseaworthiness, to entitle them to a verdict, unless rebutted by evidence offered by the plaintiff to remove the presumption. The law, we think, was correctly and carefully stated in the ruling on this point.

The third question which arose on the trial related to the testimony of Edward Thomas, whose deposition was taken by the defendants to prove that the loss was fraudulent, and who was a witness liable to be impeached on account of bad character. He was asked, on his direct examination, with a view to sustain his credit by his own testimony, before it was impeached, whether he had made certain statements in regard to the probable loss of the vessel before the event happened ; and his answer, upon being objected to by the plaintiff, was rejected. We think it is very clear that a witness cannot be allowed to state, on the direct examination, that he communicated to third persons, at prior times, the same or other particular facts, with the view of strengthening his testimony. To permit such statements is not within the acknowledged rules of evidence, as known and practised upon in this Commonwealth ; and the introduction of such a practice, we fear, would open the door to great frauds in the hands of dishonest persons.

18 *

The question in fact presented to the consideration of the court, on the argument, was this; whether a witness of bad character, who testifies to a case of fraud, can be corroborated by the party who calls him, by proving that he has made similar statements to others of the same facts.   This question is one of much importance, and has been elaborately argued ; and the authorities supporting and denying the proposition have been carefully investigated.   But the point was not ruled upon, nor was it in fact raised on the trial.   The presiding judge stated, that " if it should become a material fact, that the witness declared his knowledge to other persons, and such persons should be called to testify to it, this decision would not preclude such evidence when offered; that it might stand on a different footing ; that the evidence was offered to support the deponent's own credit, for which purpose it was inadmissible."   But no such evidence was afterwards offered. Under these circumstances, we do not feel called upon to decide the question argued, it being an abstract proposition, but reserve the expression of an opinion till it-actually arises, and is judicially presented for our consideration and judgment.

*Judgment on the verdict.*