LYDIA A. McGINLEY, Respondent, *against* THE UNITED STATES LIFE INSURANCE COMPANY, Appellant,

(Decided June 3d, 1878.)

The question whether or not the habits of life of a particular person are temperate is one of fact, and when a jury have found upon the question from conflicting evidence their verdict will not be set aside on the ground that it is against the weight of evidence.

The test between sobriety and inebriety is the effect produced on each individual by the use of alcoholic liquors.

Declarations by the assured as to his health, made after the issuing of a policy upon his life in favor of his wife, cannot affect her rights, and are not competent evidence in an action brought by her on the policy.

* The judgment here was affirmed by the Court of Appeals June 3d, 1879.

APPEAL from a judgment entered upon a verdict rendered for plaintiff at a trial of the cause, and from an order denying defendant's motion for a new trial on the minutes.

The facts are stated in the opinion.

*Hegeman & Ingersoll,* for appellant.

*Stephen H. Olin,* for respondent.

LARREMORE, J.—The defendant issued two policies of insurance upon the life of Chas. E. McGinley for the benefit of his wife, Lydia A. McGinley, the plaintiff, upon their joint application in writing. The first policy was dated April 19th, 1866, for an insurance of $5000; the second was dated January 19th, 1871; which was a paid-up policy issued for $100, the dividends then due on the first policy. The application above referred to was made the basis of the contract of insurance, whereby it was agreed that if any untrue or fraudulent allegation was contained in the application, or in answers to the questions annexed, all moneys paid for premiums should be forfeited. The policies contained the usual stipulations, that the same should be null and void if the application or declaration upon the faith of which the contracts were made should be found to be in any respect untrue.

Chas. E. McGinley died April 11th, 1875, at Celina, Ohio. Proof of his death and demand of payment were given and made, and defendant refused to pay the amount insured, on the ground that false answers had been given to the following questions in the application for insurance :—

Q. Have your parents, brothers or sisters been afflicted with scrofula, pulmonary complaints, gout, insanity, or any other hereditary disease?

Ans. No.

Q. Have you been afflicted at any time with insanity, gout, rheumatism, fits,—since childhood,—rupture, dropsy, spitting of blood, palpitation, diseases of the heart, lungs, liver, urinary organs, brain, or any serious disease ?

Ans. Have had rheumatism.

Q. Are the party's habits of life temperate, or otherwise ?
Ans. Temperate.

Plaintiff obtained judgment against the defendant for $6007 45, from which, and the denial of a motion for a new trial, this appeal was taken.

It is settled by authority that the representations of the insured, upon the faith of which the policies were issued, are warranties, and if false or untrue in any particular the insured loses all benefit and forfeits all rights under the contract. (*Valton* v. *National Fund Life Ass. Co.*, 20 N. Y. 32; *Cushman* v. *U. S. Life Ins. Co.*, 63 N. Y. 404; *Foot* v. *Etna Ins. Co.*, 61 N. Y. 571; Bliss on Life Insurance, 48 and 179, 2d edition; *Brennan* v. *Security Ins. Co.*, 4 Daly, 296.)

This case abounds with exceptions, the materiality of which depends upon the decision of the points raised by the answers to the questions Nos. 9, 12 and 14, above mentioned.

The motion for a non-suit was properly denied. Plaintiff had established a *prima facie* case, and at that time no proof existed that McGinley was a man of intemperate habits at or about the time the policies were made. That he died in 1875 of diseases of the stomach and lungs, caused by intemperance, was insufficient to authorize the conclusion that his habits were intemperate in 1866 and 1871. The question at folio 144 was answered without exception, and as no motion was made to strike out the testimony the exception falls. The question at folio 148 was not only leading, but immaterial, and assumed a fact that had been proved. The objections at folios 154, 155, 157 and 163 were properly overruled. The exceptions 166 and 187 fell, for the testimony stood subject to the charge of the court, and that part of the answer to the seventh interrogatory, which was mere hearsay evidence, was properly stricken out.

The ruling at folio 193 was correct. Declarations made by McGinley a long time after the insurance for his wife's benefit, as to his condition of health, were not competent to affect her rights. (*Swift* v. *Mass. Mutual Life Ins. Co.*, 63 N. Y. 186; *Edington* v. *Mutual Life Ins. Co. of N. Y.*, 67 N.

Y. 192; *Dilleber* v. *Home Life Ins. Co.*, Court of Appeals, 4 N. Y. Weekly Dig. 547.

Furthermore, the alleged admission related to a disease not specifically named in the application, and it does not appear whether it was included in any of those mentioned.

There was no error in refusing the requests for special findings; the instructions given to the jury included all that was material to the issues involved, and were properly disposed of by the general verdict.

The exceptions at folios 194 and 195 will be hereafter considered. I think the rulings at folios 196, 197, 199, 202, 208, 229, 247 and 252 were correct, and for the reasons stated.

The answer to the third interrogatory was properly excluded; the testimony was necessarily hearsay, for the witness was but two years old at the time of the event of which she testified (fols. 273–274). The questions at 271 and 272 were immaterial and irrelevant, and were properly excluded. Nor do I find any error in the rulings at folios 320–1, 327, 337 and 368.

The verdict should not be set aside merely on the ground that it is against the weight of evidence (*Silva* v. *Low*, 1 John. Cas. 184; *Barnwell* v. *Church*, 1 Caines, 217; *Bogert* v. *Morse*, 1 N. Y. 337; *Morse* v. *Sherrill*, 63 Barb. 21), and the jury in this case have passed upon facts peculiarly within their province.

As to the falsity of the statements above referred to, that which relates to question No. 14 appears to have been mainly relied upon.

The fact that the father of McGinley died of pneumonia after an illness of six days (fol. 96), would scarcely justify the conviction that such parent had been afflicted with that or any other hereditary disease within the meaning and intent of question No. 9.

To question No. 12 the applicant answered, " Have had rheumatism." This was responsive; and if the defendant was not satisfied with it the policy should have been withheld until a more detailed and satisfactory answer was furnished. (*Rawls* v. *American Mutual Life Ins. Co.*, 27 N. Y. 282.)

The interests as well as the merits of the case centre in the applicant's response to question No. 14—that his habits of life were temperate.

The principle involved in the decision of this question is one of extreme delicacy and importance. It is not claimed that the mere use of alcoholic stimulants constitutes intemperance. Nor have we been referred to any fixed rule or standard of such general application that we can plainly discern the point where temperance ends and inebriety begins. Necessarily then each case of this character must be determined upon its own particular facts. Slight indulgence may produce drunkenness in A, while repeated indulgences fail to effect B. It would thus appear that the test between sobriety and inebriety is the effect produced on each individual by the use of alcoholic liquors. The court below recognized this principle, and left it to the jury to determine upon all the evidence whether or not McGinley, at or about the time of his application for insurance, was a person of temperate habits. There was nothing in the charge of the learned judge calculated to prejudice or mislead the jury.

The defendant's counsel takes exception to that portion of it which predicated the fact of McGinley's intemperate habits upon his capacity to attend to business, and his indulgence to such an extent as would impair his constitution or general health. These facts were but the indicia of the main fact, which was left entirely and exclusively to the jury.

I have examined all the exceptions in the case, and the authorities by which they are sought to be sustained, and am of opinion that they should be overruled and judgment of affirmance ordered.

CHARLES P. DALY, Chief Justice (concurring).—There was a large amount of evidence that, instead of McGinley's habits of life being temperate when he gave that answer and warranty to the enquiry propounded, he was a man who indulged in the use of spirituous liquors to such an excess as to become frequently intoxicated. His uncle and partner swore that as often as every other day he was under the in-

fluence of liquor, and hardly in a fit condition to attend to business. His sister testified that his habits had been intemperate, as regards the use of intoxicating liquors, for at least twelve years before his death; and a physician, who was intimate with him whilst he was in Celina, in Ohio, and who was his medical attendant at the time of his death, which occurred at that place in 1873, swore that the cause of his death was intemperance and debauchery, and that, judging from observation and from what McGinley told him, the duration of his intemperance must have been eighteen or twenty years or more.

The insurance was effected on the 19th of April, 1866, and witnesses on the part of the defendants testified that immediately before that time, and in 1865, they had frequently seen McGinley intoxicated, or, to use their fuller word, drunk; that he used liquor continuously; that he visited Celina, in the State of Ohio, in the spring of 1865, and remained there about three months; and that his habits whilst there were those of a man given to intemperance; that he was seen during that year at Montezuma, in that State, at a horse race, very drunk; that in June or July of that year, in that place, he was seen so drunk that he could hardly stand up—in the language of the witness, "perfectly wild;" that in 1863 he drank intoxicating liquors to excess; that a witness visited him in New York in the years 1863–6, and whilst at his house knew of his drinking immediately upon rising in the morning and before meals.

The question in the case was, what were his habits when the insurance was effected, and for such a length of time before it as might enable the jury to judge whether he was, or was not, at the time a man of temperate habits. The testimony of a large number of the defendant's witnesses was to the effect that he was, or must have been then, an intemperate man, and that his representation that his habits of life were then temperate was a false statement. But there was conflicting evidence on this point. One of the witnesses called by the defendant knew him from 1863 until he left New York in

1870. This witness was a member of a mercantile firm with him that was formed in January, 1866. He swore that he knew him very well in that year, and testified that, as far as his acquaintance went, he never knew him other than as a sober, industrious and attentive man of business, and he and this witness were at their mutual place of business daily during that time. Another witness (Walburn) was a clerk in the same store with him from January, 1866, to January, 1867. He saw McGinley there every day during that time, and testified that he never saw him intoxicated or under the influence of liquor. A witness (Jones) swore that he knew him in 1864, and for three years thereafter ; that he was with him in the same store for several months prior to the 19th of April, 1866 ; that he saw him there daily, and never saw him under the influence of liquor. McGinley had been a clerk of another witness (Harding) for several years. This witness saw him, about the first part of the year 1866, in his store almost every day. They were intimate acquaintances, McGinley often visiting at this witness's house in Brooklyn in the evenings; and he testified that he never knew that McGinley used intoxicating liquors to any amount until after 1870 ; that during the whole time that he knew him he never saw him under the influence of liquor but once, which was either in 1865 or 1867 ; and finally, another witness (Daniels), who boarded with him about the 1st of April, 1866, who saw him daily, and who knew a great deal about his habits, swore that he saw him every day for two or three months at a time during the two or three years that he boarded in his family, and that he never saw him drink a half-dozen times. He not only saw him at his dwelling, but met him at all hours of the day at his store, where the witness went to purchase goods. This witness was a merchant engaged in business at the West, who came to the city to purchase goods, and when he did so, boarded with McGinley's family. He was boarding with him when he made the application for insurance; had recommended him to get married ; said he knew his habits, and said, " I never saw him drink, I don't think, a half-dozen times in my life." In

addition to this conflicting testimony, there is more or less uncertainty among several of the defendant's witnesses in respect to dates; and it is difficult, in reading the testimony of some of the more important of them, to know whether they are referring to what they saw before April 19, 1866, and this is especially so in respect to the testimony of McGinley's uncle and partner, Hamlin, who is one of the chief witnesses for the defendants, and who, if he refers to McGinley's habit of being under the influence of liquor nearly every day, and hardly able to attend to business in 1866, and up to the time of effecting the insurance (April 19th, 1866), is in direct conflict with another partner of McGinley's (Root), who during the same time had the same opportunity of seeing him in the store during business hours. The question of fact, therefore, whether he was, when he made the written declaration upon which the insurance was effected, and for a reasonable length of time before it, a man of temperate habits, whatever he may have been antecedently, or after the insurance, was for the jury to determine upon the evidence, and we cannot say, when the evidence was of the character above stated, that the jury, in coming to the determination which they did, must have been influenced by partiality, prejudice, passion or corruption; that the testimony given by the defendants is not so overwhelming that it is impossible to account for the verdict, except from some such cause or motive. If McGinley, in the spring of 1865, when he was at Celina, Ohio, indulged in the use of intoxicating liquors to the extent described by the witnesses in that place, his habits must have undergone a great change in about a year if he was, as described by the defendants' witnesses, a man drinking occasionally with customers, but never indulging to excess, or at least never appearing to be under the influence of liquor to those in constant and daily intercourse with him at his store, and to the witness Daniels, who boarded at his house. These witnesses had certainly ample opportunities for knowing whether he was during this time the habitually intemperate man described by Hamlin. They appear, so far as can be judged from the reading of their

testimony, to have been fair, impartial and disinterested
witnesses; at least, there is nothing in their examination to
create any suspicion as to their motives, or to indicate that
they were fabricating testimony, and they were subjected to
a much more satisfactory test in a cross-examination than
the great bulk of the defendants' witnesses, as they were ex-
amined orally on the trial; whilst the testimony of seventeen
out of the twenty witnesses for the defendants was taken
out of the State upon commission. The testimony of several
of the defendants' witnesses is very direct and positive, but
we have no right, as an appellate court, to say that it is con-
trolling. Indeed, when coming to compare more closely the
testimony of the two classes of witnesses, I have been im-
pressed with the probability of the truth of what was sworn
to by the plaintiff's witnesses; with the fact that McGinley,
for some time before the insurance was effected, was as he
was described by these witnesses, and the defendants' wit-
nesses have not discriminated as to dates, or distinguished
carefully between his notorious condition after 1870 and
what they may have known or seen before the 19th of April,
1866. At all events, the question of fact was for the jury,
and we cannot say that their verdict shows such an utter
disregard of evidence that was overwhelming, palpable and
irresistible, that we should set it aside as a flagrant act of
injustice.

A large portion of the appellant's argument is devoted
to an elaborate criticism and review of the judge's definition
of intemperance, and what would be regarded as temperate
within the enquiry propounded to McGinley. The insurers
have seen fit to put out a very general enquiry—to enquire
if the habits of life were temperate or otherwise—which, be-
ing given in this general way, would seem to call for as gen-
eral an answer. " Temperate or otherwise ? " is a very loose
enquiry, which may relate to eating as well as drinking, and
to the use of other stimulants than, intoxicating liquors.
Otherwise than temperate, I infer, means intemperate; for if
anything else were intended, the enquiry would properly be
such as to elicit particular information, such as, " Do you

use intoxicating liquors—if you do, what are your habits in respect to their use ? " or other particular enquiries of like nature. The judge distinguished, and, in my opinion, with great discrimination and fairness, what would be intemperate and temperate within the meaning of a general enquiry of this kind. He told the jury that it rather depended upon the individual, for what would be temperate in the use of alcoholic drink in one man would be intemperate in another; that the taking of a moderate amount of acoholic liquor by a weak man might be an intemperate act, when it would not be by a man of vigor and strength; that it is not in the use of alcoholic drinks that intemperance exists, but in taking them to such an extent as to impair the constitution and general health. The exceptions to the charge were so loosely taken that it is not easily determined to what part of the charge they precisely apply, but from the argument of the appellant I infer that they are understood to have been taken specifically to the judge's saying, " I do not mean to say that a man who habitually, day by day, takes his drink, or drinks more or less, is intemperate, unless he does so to such an extent as to impair his constitution or general health ; " and treating the exception as applying to the whole of the proposition, I see no error in it, nor has anything in the elaborate comments of the counsel for the defendants, in my judgment, shown it to be so. His condemnation extends to the whole charge in the general statement that no other verdict than one against the company was possible or likely under the general intent of the charge, which, it is declared, was substantially in favor of the plaintiff and against the defendants, virtually directing them to find a verdict for the plaintiff. There is no foundation for this statement. The charge was a fair, impartial and discriminating presentation of the question to be passed upon, and was quite as favorable to the defendants as to the plaintiffs.

The defendants were not entitled to have any of the requests which were refused charged. The only defense raised by the evidence was that McGinley's habits of life were not temperate, and the jury were specifically told that

if his representation that they were was false, the plaintiff could not recover; and I may add, in addition, that this was implied throughout the whole charge. The judge had covered all that was embraced in the second request in his charge, or if he had not, his answer to the request was an assent to the proposition that the word intemperate means drinking to excess. The third proposition assumed facts as proved which the jury were to pass upon, as the judge said in reply to it. The forfeitures of premiums had nothing to do with the case. The proper rule in judging of the weight of evidence was the one stated in the judge's reply to the fifth request, and the request was properly refused. The sixth request was not a proposition of law, but a request to call the judge's attention to what was admitted by the plaintiff's witnesses, and it was complied with. It was not incumbent upon the judge to require the jury to make eight special findings. It was a matter entirely in his discretion.

The judgment should be affirmed.

Judgment affirmed.*

---

* The judgment here was affirmed by the Court of Appeals June 10th, 1879.