BAXTER, (LA SOCIETE ANONYME DES MINES v.) See Case No. 8,099.

## Case No. 1,124.

### BAXTER et al. v. LELAND et al.

[1 Abb. Adm. 348.][1]

District Court, S. D. New York. Nov. Term, 1848.[2]

SHIPPING—BILL OF LADING—PERILS OF THE SEAS—SWEAT—CARRIERS — LIABILITY — CUSTOM OF TRADE.

1. As between the original parties to a shipment. it is competent for them to show the actual condition of the goods at the time of the shipment.

[Cited in The Wellington, Case No. 17,384.]

2. The phrases, "the dangers of the seas," "the dangers of navigation," and "the perils of the seas," employed in bills of lading, are convertible terms.

3. A dampness or sweating of the hold of a vessel, shown to be the ordinary accompaniment of a voyage from southern to northern ports, and to result not from tempestuous weather, but from occult atmospheric causes, is not a "peril of the seas."

4. Wherever a cause of injury to a cargo lies very near the line which separates excusable perils of the seas from those dangers for

---

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

[1] [Reported by Abbott Brothers.]
[2] [Affirmed in Case No. 1,125.]

which carriers are responsible, regard is to be had to the custom of the trade in determining whether it is to be classed with the perils of the seas or not.

[Cited in Barstow v. Wilmot, Case No. 1,066.]

5. Where there is a notorious custom in a particular branch of commerce, of stowing goods of a particular description on board ship in a certain way, shippers, who consider such mode of stowage hazardous, must notify carriers of their wish to have a different one adopted, or they will not be entitled to charge the latter with injuries received in consequence of its adoption.

[Cited in Barstow v. Wilmot, Case No. 1,066; The Cheshire, Id. 2,658.]

6. The propriety of the common-law rule respecting the liability of common carriers considered.

In admiralty. This was a libel in personam, by Sylvester Baxter and others, owners of the ship Cleone, against Horace Leland and others, to recover freight and primage on a cargo of flour. [Decree for libellants. This was afterwards affirmed by the circuit court in Baxter v. Leland, Case No. 1,125.]

The libel showed that the libellants had transported a cargo of 1076 barrels of flour in the libellants' vessel, from New Orleans to New York, which were consigned to the respondents at the latter port, and were duly delivered to them there. The libellants demanded $430.40 freight, and $21.52 primage. The answer set up that the flour was delivered in a damaged condition, and that the loss incurred by the respondents and chargeable to the libellants amounted to $531.50. It appeared upon the proofs in the cause on the part of the respondents, that on an inspection of the flour, when delivered at this port, 601 barrels were marked "B. bad," and 69 barrels were marked "xd. bad;" and it was further proved that the deterioration in price upon those marked "B. bad" was from seventy-five cents to one dollar a barrel; that upon the others was about twenty-five cents a barrel. For the libellants, evidence was offered tending to show that the flour was not put on board the vessel in good condition. Thus they showed that ten barrels were stained on the outside when shipped at New Orleans, though it appeared that the residue of the shipment was, so far as was indicated by external appearances, in good order. Evidence was also put in by the libellants, tending to show that by the method of transportation adopted for bringing the flour from the interior of the country to New Orleans, and also by exposure on the wharf at New Orleans, while waiting to be laden on board ship, the flour had been liable to get wet, and that it was taken on board under circumstances which might well cause its injury in the manner disclosed upon its arrival at New York. To rebut the inference sought to be drawn from these facts, the libellants gave evidence that the flour, when manufactured and put up, was perfectly sound and sweet, and that such care and attention were bestowed in forwarding it as to leave no ground to presume that it was put on board the ship in a damaged condition. It was manufactured at Ewing Mills, in the county of Muskingum, Ohio, and early in December, 1847, was forwarded by canal boat and flat-bottomed boats from the mills to New Orleans, where it arrived about January 20, 1848. The bill of lading, signed by the master of libellants' vessel, and dated February 1, 1848, contained an admission that the flour was received on board the ship in good order and well-conditioned; but a memorandum in the words "weight and contents are unknown," was added by the master before his signature. Other facts, especially such as relate to the usage prevailing amongst persons engaged in the business of shipping and forwarding like goods from New Orleans to the North, are stated in the opinion.

E. C. Benedict, for libellants.
A. P. Man, for respondents.

BETTS, District Judge. As between the original parties to the shipment, it is competent for them to show, by evidence outside the bill of lading, the actual condition of the flour at the time of shipment, (Howard v. Tucker, 1 Barn. & Adol. 712,) without the aid of this exception; and the reservation by the master, in executing the bill of lading, imposed on the shipper no obligation to give other evidence than the bill of lading itself, that the contents of the casks corresponded with the admissions in it, until affirmative evidence is furnished tending to show a mistake in the receipt in that respect.

The memorandum made by the master, that the contents and weight of the casks were unknown, does not change the character of the instrument. It operates as it would without that reservation, as prima facie evidence that the shipment corresponded with the representation, but subject to be rectified by proof that it was otherwise.

The libellants show that ten barrels were stained upon the outside when received on board, but they furnish no evidence raising a reasonable presumption that the contents of any part of the shipment were injured.

The gist of the controversy has been, on the part of the libellants, to show that the damage the flour had received arose from its inherent qualities,—from dangers of the sea,—or from the usual and ordinary damp and sweating of the ship on the voyage.

The struggle on the part of the respondents has been to make it appear that the cargo of the ship was improperly stowed, and that the injury received by the flour was occasioned by placing it in the hold of the ship on the top of hogsheads of new sugar, and laying over it sacks or bags of Indian corn.

The libellants deny their liability for the damage, should it be found to have been so occasioned, upon the assertion that the stor-

age was in consonance with the common and well-known usage of ships engaged in freighting from New Orleans to the northern Atlantic ports.

I do not think a custom has been established in this respect, which, if the loss sustained by the respondents is owing to wrongful stowage of the ship's cargo, will, of itself, exonerate the libellants from their liability as carriers. As to the essential damage, the case hinges, then, in my view of it, on the point whether it is satisfactorily made out by the respondents that the injury to the flour was caused by stowing it in juxtaposition with the sugar and corn, and that such stowage was improper and unsafe.

There seems to be no essential disagreement in the evidence respecting the condition of the hold when opened to unlade the cargo. It was found heated to a high degree. The corn in some of the bags had sprouted, and the grain was so hot as to render moving it by hand painful. This part of the vessel was filled with a strong vapor and dampness. The flour in many of the barrels was found caked or coagulated, so that it could not be separated by the hand, and in others it was soured; and there is no reason to question, upon all the proofs, that the condition and temperature of the hold would ordinarily and probably produce the consequences found to exist in respect to the flour, had it been sweet and in good condition when laden on board at New Orleans. The disagreement in the testimony is as to the probable cause of that state of the hold of the vessel.

The ship, when she took in cargo, was in sound condition, and on her arrival here was found not to have leaked at all.

It is proved, by numerous witnesses of great experience in the New Orleans trade, that vessels running north will almost invariably sweat, or disclose an interior moisture or dampness, sufficient often to be productive of serious injury to goods on board, and that this condition of the ship, except as to degree, is irrespective of the cargo she carries. The cause of this cannot be ascertained with certainty, but it appertains in no way to the insufficiency of the ship; it is generally ascribed to the sudden change of climate, and augmented, as has been usually noticed, by rough weather, and also by any natural moistness in the cargo, yet exhibiting itself to the highest degree in the cold seasons of the year.

The libellants contend that if the damage to the flour is imputable to the state of the vessel, whether produced by the sweating of the ship or the character of the cargo, they are exonerated from liability;—on the first supposition, because their undertaking does not guarantee against loss; and on the second, upon the custom or usage of the trade, which justifies this method of stowage; and also on both, by the exception in the bill of lading, of "the dangers of the seas," in one copy, or

"the dangers of navigation," as expressed in the other. It is to be remarked that this change of phraseology is not to be understood to indicate any different intent with the parties; and either mode of expression, standing without qualification in an instrument of this character, should be accepted as equivalent to "perils of the sea," and all are treated in the cases as convertible terms. In The Reeside, [Case No. 11,657,] and Aymar v. Astor, 6 Cow. 267, the exception was of "dangers of the seas," and in Fairchild v. Slocum, 19 Wend. 329, the "dangers of Lake Ontario;" and these exceptions were regarded by the courts as of the same significance as the common one of perils of the seas. It is, however, plain that the exception is not to be understood as embracing those losses flowing from culpable or negligent stowage of cargo,—2 Sumn. 568, [The Reeside, supra,]—or other improper acts of the master or owner, which are proximate causes of the loss,—Story, Bailm. § 512; Abb. Shipp. 384, 385; 3 Kent, Comm. 300.

So, also, upon the authorities referred to, the dampness or sweating of the ship cannot properly be ranked in the class of perils of the sea. Tempestuous and violent weather tends to increase this difficulty, but does not produce it; all the testimony showing that it occurs in smooth and quiet voyages, when there is no straining or unusual rolling or pitching of the ship. Its causes are probably atmospheric, but whether ascribable to that source or to others more occult, it is attended but imperfectly with those characteristics which might class it with perils of the sea. Story, Bailm. § 512; 3 Kent. Comm. 216, 217. It is of ordinary occurrence, scarcely failing to exist in any case of navigation from New Orleans to northern ports, in the cold seasons of the year. It does not result from, nor is it accompanied by, any irresistible force or overwhelming power, nor does it take the aspect of inevitable accident, in the sense of a sudden or violent occurrence, although it cannot be guarded against by the ordinary exertion of human skill and prudence. Story, Bailm. § 512. It is a quiet, secret exhalation, generated from the hold of the vessel, and in no other known way produced by winds and waves and navigation than that these are the agents and accompaniments of her transit out of a warm into a cold climate.

But although within the fair import of the exception in the bill of lading, the master or owners may not be protected from answering for such injury, I think they are not, in their capacity of carriers by water, absolutely responsible for the injury, in so far as the damage is not incontestibly traceable to faulty stowage; because, if occurring otherwise, or if the testimony leaves it doubtful whether the damage was not occasioned as well by other causes as the manner of stowage, they are entitled to the benefit of the

known custom or usage of trade in this respect as a protection against liability for the loss.

The testimony in the cause proves a uniform and well understood usage in the trade between New Orleans and New York, that injuries received by goods from the sweating of the vessel should be borne by the goods alone.

Chancellor Kent says, what is an excusable peril depends a great deal upon usage, and the course and practice of merchants; and it is a question of fact to be settled by the circumstances peculiar to the case. 3 Kent, Comm. 217; Trott v. Wood. [Case No. 14,190.] And in the case of Gordon v. Little, 8 Serg. & R. 533, a general usage was admitted in evidence to lessen the responsibility of carriers.

In a case, then, hovering very closely upon the verge of the well-settled doctrine which would exempt the master from liability because the loss was incurred by a peril of the seas, I think there is just propriety, if the particular instance merely fails to fall within that rule, in applying to it the principle that the usage of the trade shall determine the question of liability. There is no evidence that the loss was ever claimed, in such cases, of the owners of the ship. It was. for a period of time, attempted to charge these losses upon the underwriters of the ship, under a special clause then inserted in policies, and supposed to cover this peril. Since that clause has been excluded, it is in proof that the uniform usage has been to charge the loss upon the goods as a peril belonging to them, and not covered by the responsibility of the carrier. I shall adopt that as the principle governing the question as to part of the damages claimed in this case. That will discharge the libellants from the claim of damages for the injuries to sixty-nine of the barrels, there being no evidence of any injury to them beyond what would probably be sustained from the sweating or dampness usually occurring in ships on such voyages. If. as is contended, the flour was soured by the steam arising from the sugar, that fact could be shown by its smell or taste, as in such case the flavor of the sugar, it is proved, is imparted to the flour. There is no proof that this was so affected. So, also, in respect to this portion of the cargo, the small damage occurring might be with much reason ascribed either to causes inherent in the article, or to those engendered in its consecutive changes of climate, in the transportation from the mills where it was manufactured to this market, although it was apparently merchantable and sound when delivered to the ship. The evidence shows that cargoes of flour thus circumstanced are so frequently found slightly deteriorated when delivered here, as to establish that to be a probable if not necessary concomitant of such course of transportation.

The remaining inquiry relates to the six hundred and one barrels, and involves two considerations:—

1. Whether the sugar and corn, or either, have been direct and active agents in producing the damage sustained by the flour.

2. Whether it was improper stowage to place the flour in proximity with those articles, in the manner in which this cargo was laden, so as to subject the master to answer for the consequences.

There is no evidence but that the sugar casks were sound and properly coopered, or that there was any actual leakage from them. I do not rehearse the proofs as to the effect of stowing flour in a close hold in connection with sugar and corn. Very many witnesses were examined, and the result of the testimony on this point must be taken as establishing that such stowage as was made in the lower hold of this ship would account for the damage received by the flour, and that these consequences would most probably follow from it. The stowage, itself, was every way proper in securing the hogsheads, barrels, and bags in their places; but the sugar and corn exposed the hold to an extraordinary heat and dampness by their exhalations, which would naturally be prejudicial. to the flour exposed thereto.

Five hundred and fifty-three barrels were taken from the lower hold, all in a very bad state. These had been placed on hogsheads of sugar, and sixty or eighty bags of corn thrown in among the barrels, or on them, and then the hatch between decks was battened down. The rest of the flour was placed between decks, where cotton and corn were also stowed.

I do not find enough in the proof to satisfy my mind that any part of the flour between decks was injured by the evaporations or fumes from the sugar, and think whatever damage it sustained may be imputable to the ordinary sweating and dampness of a sound, tight ship on such voyage.

But it appears to me that the evidence very satisfactorily establishes that a moving cause, if not the proximate one, of the damage to the flour in the lower hold, was the placing it in tiers over hogsheads of sugar, and stowing amongst and over the barrels, bags of Indian corn. The proof is direct and full from persons conversant with like shipments, and employed in receiving such cargoes from New Orleans and storing them here, that the common consequence of placing sugar near flour, even in open situations, is to impart a smell and flavor to the flour, diminishing its value, and that the manner in which this cargo was stowed, in the lower hold of the ship, would naturally tend to communicate a like damage.

The testimony of several shipmasters of large experience, and also of marine surveyors and stevedores, has been given, all concurring that for many years past it has been

the familiar usage with general ships, freighted at New Orleans, to lade cargoes in the manner done in this case; that the great bulk of shipments at New Orleans for this port, consists of cotton, sugar, and provisions, including flour; and that there is no objection raised by shippers, or hesitation on the part of stevedores and masters, in stowing flour in barrels properly dunnaged, over hogsheads of sugar, in any part of the ship, and that without regard to the time the sugar has been manufactured; and that this mode of lading cargoes in general ships at that port is notorious here and at New Orleans, to persons concerned in forwarding or receiving produce; and these witnesses are of opinion that such stowage does not of itself necessarily cause injury to flour laden in that manner.

The agents and shippers at New Orleans, and the respondents, are connected in business; and the bookkeeper of the respondents testifies that he wrote for them to their agents in New Orleans not to ship flour with sugar and corn on board.

Independent of the implied recognition of the course of business, this is direct evidence that the claimants were aware of the usage, and if they intended to have their goods carried in any other than the customary manner, it was incumbent on them to give the master specific directions.

A case involving a similar principle was decided in this court, in Sabbich v. Prince, [Case No. 12,192.] The agents of the respondents shipped at Bordeaux, in France, a quantity of mulberry trees on board of the libellant's vessel. The agents knew the vessel was laden with wines, and that the trees would be stored in the hold with the wines. No notice was given the libellant that such stowage would be hazardous to the trees. On delivery at this port they were all found to be dead; and it was contended by the respondents, on the proofs, that the destruction of the trees was occasioned by the effluvia and fumes generated in the hold by leakage or exhalations of the wines.

The decision of the court upon that branch of the case was, that the shipmaster was not liable for the destruction of the trees by that cause, for want of notice or caution to him, that the claimants would charge him with the risk, inasmuch as it appeared to be the usual and customary method of lading that description of cargo at the port of shipment.

The case of Faber v. The Newark, [Case No. 4,602,] decided in this court in February, 1844, turned in some measure upon the same doctrine; although in that case the additional particular was determined by the court, that the loss was occasioned by perils of the sea.

The action there was to recover damages to a lot of tobacco shipped with oil, grease and lard, and stained by the grease or oil which had leaked from the casks. The court intimated the opinion that the ship was discharged from liability by proving the casks to have been safely and properly stowed and secured by dunnage, and not so placed in relation to the tobacco as to expose the latter to be directly affected by the drainage or leakage of the casks, if such leakage had occurred as an ordinary incident of transportation.

So, also, I understand the rule to be laid down by Judge Story, in the case of The Reeside, [Case No. 11,657.] He rejects, to be sure, the proof of usage or custom in the trade, throwing, under like circumstances, the loss on the owners of the cargo, but only because it was offered in contradiction of and at variance with the express terms of the bill of lading.

The libellant, in that case, shipped on board the schooner several bales of carpeting, which were greatly injured on the voyage by oil which leaked from casks stowed contiguously to the carpeting. The libel alleged that the carpeting was improperly stowed near the oil casks. The judge says, in his opinion, "It would have been very fit and proper to have stowed the carpeting in a more prudent manner, in some other part of the vessel." But he determines that "there was no bad stowage in the case."

The decision against the vessel turned upon the fact that the master had taken the casks on board in very bad order, and very improperly coopered. 2 Sumn. 572, [The Reeside, supra.] The manifest implication is, that but for the positive fault of neglecting to cooper the casks sufficiently, the ship would not have been liable for a damage which was occasioned by the improvident proximity of the carpeting to the oil casks, and not to perils of the sea.

The question is one of great moment in relation to the mercantile navigation of this country, and viewed in connection with the common-law doctrine of the responsibility of common carriers, is not free from embarrassment and doubt.

The stringency of the common law, in respect to common carriers on land, is certainly relaxed in many particulars of importance, in its application to ships and ship-owners in the carriage of goods by water. Story, Bailm. §§ 509, 512, 513. If some of the English judges have recently indicated a disposition to fall back upon the rigor of the old doctrine, and enforce it against carriers by water, (Riley v. Horne, 5 Bing. 217,) and some American authorities have echoed the sentiment, (21 Wend. 190; 2 Story, 17, [Citizens' Bank v. Nantucket Steamboat Co., Case No. 2,730;] 3 Story, 349, [King v. Shepherd, Case No. 7,804,]) and have pushed it to the extremity that the liability cannot be restricted or qualified by notice of usage, (19 Wend. 234, 251; 21 Wend. 153, 354; 26 Wend. 591,) yet I think it is manifest that the gradual though slow advance in the amelioration of the ancient dogma in respect to common carriers, tends to place their implied respon-

sibility on a footing, in its essential features, in harmony with that of other parties performing undertakings of trust for a reward, (2 McLean, 157, 540, [Maury v. Talmadge, Case No. 9,315; Hubbard v. Turner, Id. 6,819;] [Venable v. Bank of U. S.,] 2 Pet. [27 U. S.] 115; [Stokes v. Saltonstall,] 13 Pet. [38 U. S.] 181; 2 Brev. 178; 16 Vt. 52.) And, indeed, it is difficult to reconcile the anomalous severity of the liabilities imposed by law upon common carriers with the rational obligations of a hiring or trust, except upon the assumption that they undertake their employments with full assent to become insurers. If the rule and measure of their liability were now to be first introduced into our jurisprudence, it can scarcely be expected that it would be framed or sanctioned upon the implication that they were to be dealt with as common thieves and robbers; yet that seems the essential groundwork of the old rule.

No reason, very palpable to the understanding, exists for discriminating between the responsibility of a person undertaking to transport goods from place to place, and that of another who is the depositary of them. In the ordinary course of things there is as equal opportunity to the depositary as to the carrier to convert the goods, if such be his disposition, to his own use; and the same risk of having them lost to the owner through accident or exposure, involuntarily on the part of. the depositary, and without any means of proving fault or negligence against him. Yet warehousemen, wharfingers, &c., are relieved of the operation of the rule governing the carrier who brings goods to or takes them from his charge. 2 Kent, Comm. 591, 600, 601, and notes.

In the decision of this cause, however, I do not intend to trench upon the rules fixing the liability of carriers, further than those rules may be claimed to bind them as absolute insurers of the goods transported, irrespective of the custom or usage of the business or trade with which the transaction is connected, and regardless of deterioration or loss of the goods by inscrutable natural agencies, without fault of the carrier.

I hold, in this case, that the flour was stowed conformably to the usage of the trade in freighting in general ships, known to the respondents; that the ship was sound and tight; that the shipment was delivered in apparently like condition to that in which it was received on board, except slight stains upon the barrels from mould or damp, which are not proved to have affected their contents; that the libellants are not responsible for injuries received by the flour in consequence of the mere sweating of the ship, or in consequence of exhalations or vapors arising from other parts of the cargo, which was well stowed and secured. I accordingly pronounce in favor of the libellants for the freight and primage demanded, and costs of suit to be taxed. Decree accordingly.