THE TITANIA. (Two Cases.)

*(District Court, S. D. New York.* December 29, 1883.)

1. SHIPPING—LEX LOCI.

   On a shipment of goods in England, upon an English vessel, on an ordinary bill of lading, the liability of the vessel is to be determined according to the law of the place of shipment, as the law of the flag.

2. SAME—INSURANCE—BILLS OF LADING—EXCEPTION—DAMAGE THAT MAY BE IN-SURED AGAINST.

   A clause in a bill of lading that the ship-owner shall " not be liable for any damage to goods capable of being covered by insurance," *held,* to refer only to insurance obtainable of the ordinary insurance companies, in the usual course of business, or on special application, and not to insurance which might possibly be obtained in special or peculiar insurance associations, and thus construed, was a valid exception.

3. SAME—STOWAGE—INJURY TO GOODS.

   Where goods in one of the compartments of the steamer T. were injured by a spare propeller which was stowed and fastened in the same compartment, and on the T.'s sixth voyage broke loose during a severe gale, and, in being tossed about, broke through the sides of the ship, whereby water was taken aboard, *held,* that the damage thus caused was a damage by a "peril of the seas," and within the exceptions of the bill of lading, it being found that the propeller was properly stowed.

4. SAME—SEAWORTHINESS.

   Proper stowage of articles which, on becoming loose, may imperil the safety of the ship, is one of the elements of seaworthiness.

5. SAME—AVOIDING DAMAGE—NEGLIGENCE.

   Where the damage might have been avoided by the use of ordinary care and diligence on the part of the ship, the insurers are not liable; the negligence, and not the perils of the seas, is then considered the proximate cause of the loss.

6. SAME—CUSTOMS AND USAGE.

   The seaworthiness of a vessel is to be determined with reference to the customs and usages of the port or country from which the vessel sails, the existing state of knowledge and experience, and the judgment of prudent and competent persons versed in such matters. If, judged by this standard, the ship is found in all respects to have been reasonably fit for the contemplated voyage, the warranty of seaworthiness is complied with, and no negligence is legally attributable to the ship, or her owners.

7. SAME—SHIP-OWNERS' LIABILITY.

   Though ship-owners are liable for latent defects, this principle does not affect the seaworthiness of the vessel where, if all the facts were known at the time she sails, she would still be regarded by competent persons as reasonably fit for the voyage, according to the existing knowledge and usages.

8. SAME—PROPER STOWAGE.

   Stowage, according to custom and usage, and the best judgment of experienced persons, is sufficient to protect the ship from the charge of negligence, as against insurers.

9. SAME—CASE STATED.

   Upon the facts in this case, *held,* that the spare propeller was sufficiently stowed, according to such knowledge and judgment; that the vessel was sea-

*worthy at the time she sailed; that the injury to the goods could be covered by an ordinary policy of insurance; and that the libelants could not, therefore, recover of the ship or her owners for the damage in question.*

The libels in these two cases were filed to recover damages for injuries to merchandise, consisting of burlaps and paper stock, during the voyage of the steamship Titania from Dundee to New York, through the spare propeller becoming unfastened and being tossed from side to side in the ship in the compartment where these goods were stowed. The Titania was a steamship belonging to the Red Cross line of steamers, plying between Dundee and New York. The goods were shipped on the ninth of October; the vessel sailed from Dundee on the 11th. On the forenoon of Saturday, the 22d, when about two days off from Halifax, she encountered a "hard gale and very heavy sea, and the ship labored heavily, the ship lurching at times 35 degrees," according to the statement in the log. The gale increased throughout the day, the ship rolling fearfully. At half past 9 in the evening, it being found that the ship was making water, an examination was made, and the spare propeller between decks was found to be adrift, and that it had knocked holes through the iron plates on each side of the ship in that compartment; and parts of the cargo and dunnage were afloat in the water taken in through these holes. The Titania thereupon put into Halifax, accompanied by another vessel, where she arrived on the morning of the 25th; after repairs she proceeded to New York, which she reached on the second of November. The Titania was a steamer of about 1000 tons, and her building was completed in May, 1880. This was her sixth trip across the Atlantic. The spare propeller, weighing from four to five tons, was put between-decks near the mainmast, and secured by chains carried through the boss at the axis of the propeller, and fastened to four ring bolts, secured to iron plates, which were riveted through the iron deck, one between each blade of the propeller, with wooden chocks near the ends of the blades.

A good deal of evidence was given on the part of the claimants tending to show that it was customary for steamers to carry a spare propeller, and that this one was fastened in one of the most approved modes, and in the usual manner, with the best material, and in strict accordance with Lloyd's rules, special survey, and believed sufficient by persons having very large experience in fastening and securing such propellers. Before leaving Dundee on the last trip, the chief officer, as he testified, examined the fastening of the propeller carefully, feeling each turn of the chain, and found it taut and tight, as on the previous voyages. After the accident the chain was found in pieces; one of the ring-bolts broken, and one of the plates torn and rent; the rivets were out of their holes; but the margin of the holes did not present the appearance of the bolts having been drawn out through them. The chains had been made taut by wooden wedges, driven between the top of the boss and the chains above, near where

the chains pass down through the holes in the center of the boss. The bill of lading contained the usual exception of injury through "perils of the sea," and various other special clauses, among which it was provided that the ship-owner is "not to be liable for any damage to any goods which is capable of being covered by insurance."

The libelants contended that the vessel was unseaworthy, when she sailed, through the insufficient fastening of the propeller. The defects alleged were, chains of insufficient size; an insufficient number of rivets fastening the plates to the deck; that the deck beneath was not strengthened; that the chocks were not bolted to the deck; but, most important of all, that the wedges which were used for tightening were of yellow pine, and too small in size. Through the loosening of these wedges, as it was surmised by the libelants, some play was probably first afforded for the motion of the propeller, and after that, in the heavy rolling of the ship, breaking loose naturally and inevitably followed. There was no evidence, however, to show what first gave way, or in what particular manner the propeller broke loose. The Titania on this voyage was very light, and in consequence rolled more than she otherwise would in the heavy seas. The claimants contend that the ship was in all respects seaworthy; that the fastenings of her propeller were in all respects proper and sufficient; and that the accident was properly to be ascribed to the perils of the seas; and also that the loss in question was subject to the special exception above referred to, because it was capable of being covered by insurance.

*Treadwell Cleveland*, for libelants.

*Goodrich, Deady & Platt*, for claimants.

BROWN, J. The bills of lading in these cases contain numerous exceptions from liability on the part of the ship-owner, only two of which seem applicable to this case, namely, the general exception of "perils of the seas," and the special exception that "the ship-owner is not to be liable for any damage to any goods which is capable of being covered by insurance." If the breaking loose of the propeller and the consequent damages to the goods arose through negligence in the proper stowage or fastening the propeller, then it cannot be covered by either of these exceptions. The shipment being made in England, and on an English vessel, the law of the flag governs. *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115; *Chartered, etc.,* v. *Netherlands,* 9 Q. B. Div. 118; 10 Q. B. Div. 521; *The Gaetano & Maria,* 7 Prob. Div. 137; *Woodley* v. *Mitchell,* 11 Q. B. Div. 51. But although, under the English decisions, it seems to be settled that ship-owners may exempt themselves from damages caused even by their own negligence, provided this intention be unequivocally expressed, (Macl. Ship. 409, note; *Chartered Mercantile, etc.,* v. *Netherlands, etc.,* 9 Q. B. Div. 118, 122; 10 Q. B. Div. 521; *Steel* v. *State Line, etc.,* 3 App. Cas. 88;) yet such causes of special exemption, being inserted for the benefit of the ship-owner, are construed most favorably to the shipper and most

strongly against the ship-owner, and will not be held to embrace the latter's own negligence, unless that be specially excepted in connection with the actual cause of the loss. Macl. 409, 509, 510; *Hayn* v. *Culliford*, 3 C. P. Div. 410; 4 C. P. Div. 182; *Taylor* v. *Liverpool, etc.*, 9 Q. B. 549.

The clause in relation to insurance cannot reasonably be construed as intended to mean any possible insurance, in any possible company, and upon any possible premium. It must be held to refer only to insurance which might be obtained in the usual course of business from the ordinary insurance companies, either in the usual form, or in the customary mode of business, on special application. The evidence on the part of the libelant shows, however, that no insurance against negligent stowage of the propeller could be obtained in any ordinary insurance company either in the usual course of business or on special application. On cross-examination one of the witnesses stated that he had heard of companies or associations in England that insured against everything; but he did not know of any such company, and he had never seen any such policy. An association somewhat like that, with the terms of the mutual obligations of its members, appears in the case of *Good* v. *London Steam-ship Owners' Mut. Prot. Ass'n*, L. R. 6 C. P. 563. The defendants, however, gave no further evidence in regard to such associations, and it seems clear to me, even if their existence had been proved, that possible insurance or indemnity in such mutual protective associations, with their peculiar terms and conditions, is not to be construed as the insurance referred to in this clause of the bill of lading. I see no reason, however, for not regarding the clause as valid, construed as referring only to insurance which might be effected in the ordinary course of insurance business. Thus construed, it exempts the ship-owners from loss which might be thus insured against, and which might be recovered of the insurers, if not directly caused by negligence on the part of the ship.

The question in this case is, therefore, practically, a question between the ship-owners and the insurers; for if the libelant under this restrictive clause did not obtain insurance, it was his own fault, and the liability of the ship-owners is not increased. And the question is, whether the injury to the goods is to be deemed caused by a peril of the seas as the proximate cause of the loss which would be covered by an ordinary marine insurance, or whether it was caused directly by negligence on the part of the ship. The damage itself is within the terms of ordinary marine policies; but if it might have been avoided by the use of ordinary care and diligence on the part of the defendants, then the insurers would not be liable; for in such cases the negligence, and not the peril of the seas, is deemed the proximate cause of the loss. Story, Bail. § 512a; *Clark* v. *Barnwell*, 12 How. 280; *Gen. Mut. etc.*, v. *Sherwood*, 14 How. 351, 364; *Lamb* v. *Parkman*, 1 Sprague, 353; *Woodley* v. *Mitchell*, 11 Q. B. Div. 47; *Ionides*

v. *Universal Marine, etc.*, 14 C. B. (N. S.) 259; *Chartered Mercantile Bank* v. *Netherlands, etc.*, 9 Q. B. Div. 118, 123; 10 Q. B. Div. 521, 543. And if the ship is to be deemed unseaworthy at the commencement of the voyage, by reason of any improper or negligent stowage of the propeller, the policy of insurance would not attach; and the ship would also be answerable upon an implied warranty of seaworthiness. Arn. Ins. 4; 1 Pars. Mar. Ins. 367, 368; Macl. 406, 407.

There is no suggestion of any fault on the part of the ship after she sailed. If there was any negligence in regard to the spare propeller, it existed at the time of sailing. Moreover, the shape and weight of the propeller were such as manifestly to endanger the safety of the ship, if improperly stowed and fastened. Hence, the stowage of the propeller directly affected the seaworthiness of the ship, and the question, therefore, comes down to this; was there any such negligence or want of care in the stowage and fastening of this spare propeller as made the ship unseaworthy at the time of sailing on this voyage, or such as would prevent a recovery on an ordinary policy of insurance for this damage? The evidence shows, in this case, that the propeller broke loose during severe gales, and while the ship was rolling in an extraordinary manner. This great rolling was doubtless in part due to her lightness on the voyage, the deck on which the propeller was fastened being four feet nine inches above the waterline. But it is not suggested or claimed that there was any such lightness of the vessel as rendered her in any way unseaworthy or unfit for the voyage. Where a ship becomes unseaworthy during severe weather, or one part of the cargo does damage to another part, it is manifest that neither is the ship, from a consideration of the result alone, to be pronounced unseaworthy when she sailed, nor is the cargo necessarily to be held improperly or insufficiently stowed. The question is essentially the same as respects each. If, upon all the evidence no negligence is recognizable, the damage in either case is set down to perils of the sea.

To determine the question upon the facts of this case, it will be useful to consider—*First*, what is the test or criterion of seaworthiness, and the extent of the ship-owner's obligations in that respect? As between the ship-owner and the insurer, the former is bound to provide against *ordinary* perils, while the latter undertakes to insure against *extraordinary* ones; "although," as DUER, J., observes in the case of *Moses* v. *Sun Mutual Ins. Co.* 1 Duer, 170, "to discriminate between ordinary and extraordinary losses is, in some cases, a matter of great nicety and difficulty." By extraordinary is not meant what has never been previously heard of, or within former experience, but only what is beyond the ordinary, usual, or common. By seaworthiness is meant "that the ship shall be in a fit state, as to repair, equipment, crew, and in all other respects, to encounter the *ordinary perils* of the contemplated voyage." *Dixon* v. *Sadler*, 5 Mees. & W. 414; 2 Arn. Ins. *c.* 4; 1 Pars. Mar. Ins. 367; Macl. 410; *Biccard* v.

*Shepherd*, 14 Moore, P. C. 471. In the case of *Gibson* v. *Small*, 4 H.
L. Cas. 418, Lord CAMPBELL says: "With regard to its (seaworthy)
literal or primary meaning, I assume it to be now used and under-
stood that the ship is in a condition in all respects to render it *rea-
sonably safe* where it happens to be at the time referred to." In *Knill*
v. *Hooper*, 2 Hurl. & N. 277, 284, the court say: "Seaworthy or not,
is always a question for the jury, and in all cases the question for
the jury will be, whether the ship was, at the commencement of the
voyage, in such a state as to be *reasonably capable* of performing it."
In *Turnbull* v. *Jansen*, 36 Law T. (N. S.) 635, BRETT, L. J., says: "A
contract of sea insurance is against extraordinary perils; therefore,
the implied warranty of seaworthiness is that the vessel will be fit
to encounter *ordinary* perils." Substantially the same language is
employed by THOMPSON, J., in *Barnewell* v. *Church*, 1 Caines. 234; and
in *Dupont, etc.*, v. *Vance*, 19 How., CURTIS, J., defines seaworthiness
of the hull to be competency "to resist *ordinary* action of the sea."
In the case of *Adderly* v. *American Mut. Ins. Co.* Taney, 126, it is
said if the leak was such "that a prudent and discreet master, of com-
petent skill and judgment, would have deemed it necessary to ex-
amine and repair the leak, there could be no recovery; but if he
might reasonably have supposed that the vessel was seaworthy for
the voyage in which she was then engaged, notwithstanding the leak,
and on that account omitted to examine and repair, such an omission
would be no bar." In *The Reeside*, STORY, J., defines perils of the
seas to be those "which cannot be guarded against by the ordinary
exertions of human skill and prudence." 2 Sumn. 567, 571.

The standard of seaworthiness, moreover, does not remain the
same with advancing knowledge, experience, and the changed appli-
ances of navigation. 3 Kent, *288. In *Tidmarsh* v. *Washington, etc.,
Ins. Co.* 4 Mason, 439, 441, STORY, J., in charging the jury as to the
defense of unseaworthiness, said:

"The standard of seaworthiness has been gradually raised within the last
thirty years, from a more perfect knowledge of ship-building, a more en-
larged experience of maritime risks, and an increased skill in navigation. In
many ports, sails and other equipments would now be deemed essential
which, at an earlier period, were not customary on the same voyages. There
is also, as the testimony abundantly shows, a considerable diversity of opin-
ion, among nautical and commercial men, as to what equipments are or are
not necessary. Many prudent and cautious owners supply their vessels with
spare sails and a proportionate quantity of spare rigging; others do not do so,
from a desire to economize or from a different estimate of the chances of in-
jury or loss during the same voyage. * * * It would not be a just or safe
rule in all cases to take that standard of seaworthiness, exclusively, which
prevails in the port or country where the insurance is made. * * * It
seems to me that where a policy is underwritten upon a foreign vessel be-
longing to a foreign country, the underwriter must be taken to have knowl-
edge of the common usages of trade in such country, as to equipments of
vessels of that class, for the voyage on which she is destined. He must be
presumed to underwrite upon the ground that the vessel shall be seaworthy
in her equipments, *according to the general custom of the port,* or at least of

the country to which she belongs. It would be strange that an insurance upon a Dutch, French, or Russian ship should be void, because she wanted sails which, however common in our navigation, never constituted a part of the maritime equipments of those countries. We might as well require that their sails and rigging should be of the same form, size, and dimensions, or manufactured of precisely the same materials as ours. In short, the true point of view, in which the present case is to be examined, is this, was the Emily equipped for the voyage in such a manner as vessels of her class are usually equipped in the province of Nova Scotia and port of Halifax for like voyages, so as to be there deemed fully seaworthy for the voyage and sufficient for all the usual risks? If so, the plaintiff on this point is entitled to a verdict."

The question of seaworthiness, therefore, as regards the implied warranty in favor of the insurer or of the shipper of goods, is to be determined with reference to the customs and usages of the port or country from which the vessel sails, the existing state of knowledge and experience, and the judgment of prudent and competent persons versed in such matters. If judged by this standard, the ship is found in all respects to have been reasonably fit for the contemplated voyage, the warranty of seaworthiness is complied with, and no negligence is legally attributable to the ship or her owners. Where actual defects, though latent, are established by the proofs, that is, such defects as at the time when the vessel sailed would, if known, have been considered as rendering the vessel unseaworthy for the voyage, such as rotten timbers, defective machinery, leaks, etc., such defects, though latent, are covered by the implied warranty of seaworthiness, and are at the risk of the ship and her owners, and the policy does not attach. 2 Arn. Ins. c. 4; 1 Pars. Mar. Ins. 369; Abb. Ship. †340; 3. Kent, *205; *Lee* v. *Beach*, 1 Park, Ins. 468; *Quebec Marine, etc.*, v. *Commercial, etc.*, L. R. 3 P. C. 234; *Work* v. *Leathers*, 97 U. S. 379; *The Vesta*, 6 Fed. Rep. 532; *Hubert* v. *Recknagel*, 13 Fed. Rep. 912. But this principle cannot be applied to cases where, all the circumstances being known, the vessel would still be deemed by competent persons, and according to existing knowledge and usages, entirely seaworthy, and reasonably fit for the voyage, although subsequent experience might recommend additional precautions. It was long ago held, (*Amies* v. *Stevens*, 1 Strange, 128,) and is laid down in Abb. Ship. †389, as elementary law, that "if a vessel reasonably fit for the voyage be lost by a peril of the sea, the merchant cannot charge the owners by showing that a stouter ship would have outlived the peril." This principle applies equally to the stowage of the cargo.

The same result is derived from a consideration of the question as a matter of stowage only, not affecting the seaworthiness of the ship. For it is well settled that in determining what is proper stowage, the customs and usages of the place of shipment are to be considered, and if these customs are followed, and if none of the known and usual precautions for safe stowage are omitted, no breach of duty, or negligence, can be imputed to the ship; and in case of

damage under great stress of weather, the injuries will be ascribed to perils of the seas, and held to be chargeable upon the insurers. In 3 Kent, *217, it is said: "What is an excusable peril depends a good deal upon usage and the sense and practice of merchants, and it is a question of fact to be settled by the circumstances peculiar to the case." This point was much discussed in the case of *Lamb* v. *Parkman*, 1 Sprague, 343, in which SPRAGUE, J., says, (page 350:)

"The question before the court is whether there was a want of proper skill and care in stowing the cargo. Improper stowage is distinctly set up in the answer as the first ground of defense. Now, it having been shown that this cargo was stowed in accordance with an established usage, why is not that decisive in favor of the libelants? * * * Suppose a question had arisen whether this cargo was sufficiently protected by dunnage at the bottom or sides, must it not have been decided by usage? And if so, why not as to the top? It must be presumed that the parties intended that this cargo should be stored throughout in the usual manner."

The same point was decided in *Baxter* v. *Leland*, Abb. Adm. 348, and in *Carao* v. *Guimaraes*, 10 FED. REP. 783. And in the case of *Clark* v. *Barnwell*, 12 How. 283, the court say, in reference to any possible negligence in the stowage: "For aught that appears every precaution was taken that is usual or customary, or known to shipmasters, to avoid the damage in question;" thereby clearly indicating the rule of diligence applicable to such cases.

I have not been referred by counsel to any case closely resembling the present; that of *Kopitoff* v. *Wilson*, 1 Q. B. Div. 377, is, however, similar, though much stronger in its evidence of negligence than the present. There the defendant's ship had taken aboard large quantities of armor plates to carry to Cronstadt. They weighed from 15 to 18 tons each, and were placed on the top of a quantity of railway iron and then secured there by wooden shores. There was a conflict of testimony as to whether this was or was not a proper mode of stowing them. The plaintiffs contended that it was improper, and made the ship unseaworthy for the voyage. She encountered bad weather, rolled heavily, and after she had been out at sea some hours one of the armor plates broke loose and went through the side of the ship, which, in consequence, went down in deep water and was totally lost with all her cargo. On the trial before BLACKBURN, J., and a jury, to recover for the loss of the plates, the question was left to the jury to determine whether the vessel, as regards the stowing, was *reasonably fit* to encounter the ordinary perils that might be expected at that season from Hull to Cronstadt; if not, was the loss occasioned by that unfitness. The jury found on the first question, in the negative, and on the second, in the affirmative; and thereupon a verdict was directed for the plaintiff. The court *in banc*, upon a rule *nisi*, held these instructions correct.

In the present case no fault is found with the place or general method of stowing and securing this spare propeller. The general plan of securing it was approved by the libelant's witnesses; and

the expert upon whose testimony the libelant chiefly relies as to the unseaworthiness of the ship, suggested for her return voyage, after this accident, no change in the place or general method of securing the spare propeller, but only the addition of a few more rivets, a heavier chain, and the fastening of the chocks to the deck. These are obviously matters of detail necessarily depending upon the judgment of persons in charge of such work.

From the large mass of evidence on this subject put in by the claimants, it seems to me impossible to hold that this propeller was not stowed and secured in a manner believed and judged, by persons having the largest experience and who were most competent in such matters, to be sufficient and safe in all respects. The ship was built, and this propeller was stowed and fastened, under the inspection of one of the Lloyd's surveyors, who testified that it was well and properly done, and was approved by him as the representative of the underwriters. And even in view of the accident which afterwards happened, he still gives it as his opinion that it was well and sufficiently secured, and that something extraordinary must have happened to account for its breaking loose. What did happen to cause its getting loose does not appear. The proof of the good quality of the material and work, and of its strength, was ample. Nearly a score of witnesses, many of whom had stowed and fastened from 20 to 200 propellers each, testified that it was done according to the best and most approved method, and in all respects in the usual manner. As I have said above, the vessel had already crossed the Atlantic five times from May to October, not only without accident, but, according to the testimony of the mate, without loosening any of the propeller's fastenings. No evidence was given on the part of the libelant in any way discrediting the statements of so many witnesses, or showing that this propeller was not secured in the usual manner, and with all the usual precautions adopted in connection with that mode of stowing; and there is no reason to doubt that it was in fact secured in the same manner in which hundreds of other propellers had theretofore been usually secured, and always hitherto regarded as sufficient. No previous accident in any of this large number, similarly fastened, is known; and this accident occurred in the course of a heavy gale, accompanied by extraordinary rolling of the ship. I think, therefore, the loss should be fairly attributed to perils of the sea, as under somewhat similar circumstances was held in the case of *Barnewell* v. *Church*, 1 Caines, 217, 235, and *Dupont, etc.*, v. *Vance*, 19 How. 162, 168.

The libelant's principal objection to the mode of fastening the propeller was the use of wedges too small in size, and made of yellow pine instead of oak. The objection to the use of yellow pine was upon the ground of its liability to be "chawed" under the heavy pressure of the chains. But the testimony of the expert on this point seems to rest principally upon his experience in English ship-yards

some years ago, when, as he says, only oak wedges were in use. But as this vessel was built and the propeller fastened in the customary manner in one of the largest English ship-yards in 1880, little weight can be given to the former experience of this witness in the use of oak wedges only, if yellow pine had come into subsequent use; and that yellow pine wedges were not liable to any such injury from the "chawing" of the chains as was supposed—if yellow pine wedges were in fact used—seems to me sufficiently evident from the fact that during five voyages across the Atlantic no perceptible injurious effect was produced upon them; for if there had been any such effect it would have been discovered on the examination previous to the last voyage.

I do not consider it by any means certain, however, that the wedges used were of yellow pine. This rests upon the testimony of Mackie, towards the close of the trial. He also gave the size of these wedges, first as three and one-half inches; subsequently he undertook to make a correction of his testimony in regard to the size of the wedges, when it became manifest that the wedges must have been larger than that, in order to support the four chains which ran through each ring. His testimony on this point must be considered so grossly erroneous that I should be unwilling to rest an important part of the case on his evidence. The libelant, at the close of the case, ingeniously and naturally seeks to make the most of this testimony, both in regard to the small size of the wedges and their being of yellow pine. No question was made in regard to them in the pleadings, nor at the time when the bulk of the claimant's evidence was taken upon commission abroad, from witnesses who best knew what was used, and the defendants had no available opportunity for direct proof in regard to them. Mackie necessarily spoke only from memory in regard to what he had observed on the previous voyages, as the wedges formerly used were not on board when the ship arrived; and it is possible that in the three years since this accident, the wedges which he remembers seeing may have been those put in at Halifax, where the Titania went for repairs, or those put in here for the voyage after the accident. In the subsequent survey, moreover, and in the particular directions given by the chief expert for the libelant, no directions whatever were given in regard to wedges. This, it seems to me, is strong contemporaneous evidence that the particular kind of wedges to be used was not considered material; if so, some directions on that point would naturally have been embodied in his recommendations. The same observations apply in regard to the wedges being single or double. In a matter of detail of this kind arising near the close of the trial, and resting upon the doubtful testimony of a single witness, who had no particular call to observe the matter attentively, I think much greater weight should be given, if the matter be regarded as in fact very material, to the mass of testimony showing that in all the details of the work the propeller was secured in the usual and customary manner, and in the mode fully approved by

competent judges and by previous experience. Every conceivable motive existed on the part of the owners to secure this, and I think the evidence requires me to find that this was done, notwithstanding the criticisms of the libelant's witnesses as to a few details, made after the event.

I must hold, therefore, that the vessel, in respect to the stowage of the propeller, was seaworthy at the time of sailing on this voyage; and that the damage to the libelant's goods arose through the perils of the seas in the severe gale and the extraordinary rolling of the ship consequent therefrom; that the damage would be covered by ordinary marine insurance, and was, therefore, within the excepted perils of the bill of lading, both under the general clause, and also under the special clause, as a risk which might be insured against, covered by the ordinary marine policy.

The libels should therefore be dismissed, with costs.